**AVON WESTERN CORPORATION et al. v. BOWLES, Price Administrator.**

No. 136.

Emergency Court of Appeals.

Heard at Washington, D. C., Aug. 8, 1944.
Decided Nov. 22, 1944.

Milton E. Sahn, of New York City, for complainants.

John O. Honnold, Jr., of Washington, D. C. (Richard H. Field, General Counsel, Nathanial L. Nathanson, Associate General Counsel, and Henry S. Sellin, Attorney, all of Office of Price Administration, all of Washington, D. C., on the brief) for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

MAGRUDER, Judge.

Complainants in this case are a group of live poultry dealers in New York City, engaged in handling live poultry purchased from points outside the City of New York, and mainly from outside the State of New York, for resale to intermediate wholesalers and retailers. They challenge the validity of certain grading provisions relating to live poultry and consequent price differentials contained in Revised Maximum Price Regulation No. 269—Poultry, as amended.

Revised Maximum Price Regulation No. 269 established dollars-and-cents maximum prices for both live and processed poultry. As originally issued (7 F.R. 10708), the regulation established maximum prices for processed poultry in terms of grades which

had been promulgated by the United States Department of Agriculture as "Tentative Grade Specifications for Dressed Poultry"; but the regulation did not prescribe maximum price differentials for grades of live poultry. Later, on March 16, 1943, by amendment No. 6 to the regulation, the Administrator established grades for live poultry as well (8 F.R. 3316). Section 1429.19(k) (3) of the regulation as thus amended provided: "The Tentative U. S. Standards for Grades of Live Poultry now in effect shall apply to all sales, purchases, or deliveries of live poultry covered herein. Revisions promulgated by the U. S. Department of Agriculture shall become concurrently effective for the purposes of this regulation for live poultry sold, purchased, or· delivered after the issuance of such revisions."

The U. S. Standards thus incorporated by reference are copied in the footnote.[1] Section 1429.19(h) (1) (i) fixed maximum prices for different classes and weights of grade A poultry items. Section 1429.19 (h) (1) (ii) fixed maximum prices for grade B poultry items, both live and processed, at 1½ cents per pound less than the maximum prices for the corresponding items of grade A poultry, and Section 1429.19(h) (1) (iii) fixed maximum prices for grade C poultry items, both live and processed, at four cents per pound less than the maximum prices for the corresponding grade A items.

At that time the complainants filed no protest against these grading provisions of the regulation.

On July 16, 1943, Congress by Joint Resolution enacted the so-called Taft Amendment, 57 Stat. 566, adding a new subsection (j) to Section 2 of the Emergency Price Control Act of 1942, 50 U.S. C.A.Appendix, § 902(j), reading as follows: "(j) Nothing in this Act shall be construed (1) as authorizing the elimination or any restriction of the use of trade and brand names; (2) as authorizing the Administrator to require the grade labeling of any commodity; (3) as authorizing the Administrator to standardize any commodity, unless the Administrator shall determine, with respect to such standardization, that no practicable alternative exists for securing effective price control with respect to such commodity; or (4) as authorizing any order of the Administrator fixing maximum prices for different kinds, classes, or types of a commodity which are described in terms of specifications or standards, unless such specifications or standards were, prior to such order, in general use in the trade or industry affected, or have previously been promulgated and their use lawfully required by another Government agency."

From the outset, the Administrator has construed the Taft Amendment as authorizing him to establish maximum prices in terms of standards or specifications not only for commodities covered by clause (4), where standards or specifications have been in general use in the trade or industry affected, or have previously been promulgated and their use lawfully required by another Government agency, but also for commodities covered by the separate and distinct provision of clause (3), namely, where the Administrator has determined, with respect to such commodities, that no

---

[1] U. S. Grade A.—Vigorous birds, well-fleshed, plump and full-feathered, with bright red comb and soft glossy skin. Must be soft-meated for birds of that class, and free from tears, bruises and deformities. Excess abdominal fat and broken bones not permitted. Must be free from external evidence of disease. A tolerance of 24% of the birds in the lot is permitted for birds of U. S. Grade B and 1% for birds of U. S. Grade C.

U. S. Grade B.—Fairly well-fleshed birds, fairly well-feathered, free from tears, bruises or deformities. Broken bones not permitted. Must be free from external evidence of disease. A tolerance of 25% of the birds in the lot is permitted for birds of U. S. Grade C.

U. S. Grade C.—May be poorly feathered birds, poorly fleshed, but not emaciated. Carcass may show few scratches, tears, or bruises. Deformed birds permitted if fairly well-fleshed. Not more than one broken bone permitted. Must be free from highly infectious diseases. No tolerance is permitted for birds that are below that of U. S. Grade C.

All cull birds must be graded as "Rejects." "Rejects" include all birds that show evidence of a sick condition, severe injury, extreme emaciation or other conditions that render them unfit for food. Birds afflicted with the following diseases are classed as "Rejects." 1. Roup (catarrhal and diphtheretic). 2. Infectious Bronchitis. 3. Fowl Cholera. 4. Fowl Typhoid. 5. Limberneck. 6. Tuberculosis. 7. Crop Bound. 8. Cripples and weak birds. 9. Water belly (Ascites).

practicable alternative exists for securing effective price control.[2] Such interpretation received approval of the court in United States v. Pepper Bros., 1944, 3 Cir., 142 F.2d 340, 343, and is not challenged by complainants here.

In conformity with the new requirement of the Taft Amendment, the Administrator on September 11, 1943, issued Supplementary Order No. 57, which amended the preamble of Revised Maximum Price Regulation No. 269 by adding thereto the following recital: "Insofar as this regulation uses specifications and standards which were not, prior to such use, in general use in the trade or industry affected, or insofar as their use was not lawfully required by another Government agency, the Administrator has determined, with respect to such standardization, that no practicable alternative exists for securing effective price control with respect to the commodities subject to this regulation."

At the same time, the Administrator issued a Supplemental Statement of Considerations to Revised Maximum Price Regulation No. 269, stating why, in his judgment, "no effective price control can be achieved in the poultry industry without the use of grade standards".

On October 9, 1943, complainants filed their joint protest against Supplementary Order No. 57, issued September 11, 1943, and against the provisions of the amended Revised Regulation, above summarized, establishing maximum prices for live poultry in terms of U. S. Standards.[3] The protest challenged the grading provisions as being in violation of the Taft Amendment, and asserted that "there was no basis in fact for the determination by the Administrator that there was no practical alternative for securing effective price control with respect to poultry". Accompanying the protest and in support thereof was an affidavit by complainants' attorney, who qualified himself as an expert on the basis of his personal knowledge and study of the industry, in which he had formerly been actively engaged as a slaughterhouse operator in Brooklyn, New York.

By order issued November 24, 1943, the Administrator incorporated into the record of the protest proceedings certain economic data and other facts of which he took official notice. Opportunity was afforded complainants, within thirty days thereafter, to offer evidence in rebuttal or explanation of the economic data so incorporated, and also to offer such further evidence relevant to the objections set forth in the protest as the protestants might desire to present. In response thereto, the protestants offered a rebuttal affidavit by their same attorney.

On March 25, 1944, the Administrator entered an order denying the protest, after which the present complaint was duly filed in this court.

The Administrator made no finding that the prescribed specifications or standards for grading live poultry had been in general use in the industry or had previously been promulgated and their use lawfully required by another Government agency. He bases the challenged grading provisions, not on clause (4) of the Taft Amendment, but rather on clause (3) thereof. Therefore, the main issue is whether the record before us discloses a rational basis for the Administrator's determination that it was necessary to establish maximum prices for live poultry in terms of grade specifications or standards because "no practicable alternative exists for securing effective price control with respect to such commodity." The Administrator's reasons for this conclusion were summarized in a Supplemental Statement of Considerations filed simultaneously with the issuance of Supplementary Order No. 57, as follows (Pike and Fischer OPA Service, 41:-1231-A):

"Although these standards were not in universal use throughout the poultry industry in the United States at the time of the issuance of Revised Maximum Price Regulation 269, nevertheless they had had sufficiently widespread acceptance by members of the poultry industry to make their adoption for price regulation reasonable and practicable.

"It is the opinion of the Administrator that no effective price control can be achieved in the poultry industry without the use of grade standards. The absence

---

[2] See statement of reasons accompanying Supplementary Order No. 55, Pike & Fischer OPA SERVICE 35:51.

[3] The Administrator concedes that the issuance of Supplementary Order No. 57 constituted new grounds for protesting the live poultry grading provisions which had been incorporated in the regulation more than sixty days before the protest was filed. See Sec. 203(a) of the Act prior to its recent amendment. 56 Stat. 31, 50 U.S.C.A. Appendix, § 923(a).

of grade standards would permit the poorest quality of poultry to sell at the same price as the finest quality. Consumer protection would be nullified, and the poultry industry, itself, would suffer, because all incentive for producing a premium quality of poultry would be removed."

Complainants' evidence consists solely of an affidavit and a rebuttal affidavit by their attorney. They offer no objection to the grading provisions applicable to dressed poultry, which they concede to be feasible and proper. But they describe in some detail the way in which live poultry is handled in the New York market, and contend that the individual inspection necessary to comply with the grading requirements could only be had at prohibitive cost and undue delay in the marketing process. Also, they point out, the quality of a live bird may change from day to day.

Further, they assert that even with individual handling of the feathered live birds, it is next to impossible to grade them according to the prescribed standards and specifications, because the flesh and condition of the body cannot readily be inspected with the feathers on, and graders might well differ as to the quality of a given bird. This particular objection was directed to the grading specifications which were in the regulation while the protest proceedings were pending. Subsequent to the denial of the protest, the Department of Agriculture amended the Tentative U. S. Standards for live poultry, effective July 15, 1944; and by amendment No. 32 to the regulation issued on July 20, 1944 (9 F.R. 8255), the grading provisions were modified to conform to the new standards, which are set out in the footnote.[4] By this change, the grades A, B, and C were replaced by two grades, 1 and 2. In a Statement of Considerations Involved in the Issuance of Amendment No. 32,[5] the Administrator said: "The Office of Price Administration has been informed that the new standards and specifications will more nearly conform to existing trade practices than did the old standards. Furthermore, the new standards are more simple and understandable and will enable Revised Maximum Price Regulation No. 269 to be more effectively enforced."

These revised standards are admitted by the complainants to be an improvement, and from the standpoint of practical application they substantially weaken the force of complainants' objection as to the difficulty of grading live birds in accordance with the prescribed standards. Furthermore, the grading provisions contain a considerable margin of tolerance to take care of bona fide errors in the application of the standards.

In support of the Administrator's position, there is included in the record an affidavit by Rob R. Slocum, an employee of the Department of Agriculture for nearly thirty-five years, during approximately twenty of which he was actively associated with the standardization and grading of

---

[4] Specifications for Tentative U. S. Standards for Individual Birds and Buying Grades for Live Poultry

U. S. Grade No. 1.—A bird of this grade must be vigorous and free from external evidence of disease. Must be well-fleshed or fairly well-fleshed and fairly well-feathered. Must be soft-meated, if of a class in which soft meat is a requirement. It must be fairly well covered with fat, and in this connection proper consideration should be given to age and sex. May have slight but not serious defects or serious deformities. Considerable abdominal fat allowed in fowl.

U. S. Grade No. 2.—Any edible bird below the quality of U. S. Grade No. 1 qualifies for this grade. It must be free from external evidence of disease or other conditions that might render the bird unwholesome for human food. A bird of thin flesh, or lacking in fat covering, or only partially feathered may be included if healthy. May have serious defects, serious deformities, or excessive abdominal fat.

Rejects.—Any bird below U. S. Grade No. 2 that is extremely emaciated or badly crippled or with other external evidence of disease or unhealthy conditions that might make it unwholesome for human food.

Specifications for Tentative U. S. Wholesale Grades for Live Poultry

U. S. Grade No. 1.—Each lot of live poultry must contain not less than 90 percent of birds of the quality of U. S. Grade No. 1, the balance to be U. S. Grade No. 2, provided no individual containers in the lot shall have more than 15 percent U. S. Grade No. 2 birds and shall contain no Rejects.

U. S. Grade No. 2.—Each lot of live poultry shall consist of U. S. Grade No. 2 birds or better and shall contain no Rejects.

No Grade.—Lots of poultry containing Rejects shall be classed as "No Grade."

[5] Pike & Fischer OPA SERVICE 41:-1240JJ.

poultry products. Mr. Slocum at present is Principal Marketing Specialist in the Poultry Products Division, Dairy and Poultry Branch, Food Distribution Administration, Ward Food Administration; also, Chief of the Market Standards and Facilities Section of the Poultry Products Division. He points out that for many years there has been a gradual trend in the industry in the direction of developing commercial grading of poultry, live as well as processed. He states: "When live poultry was shipped to terminal markets for sale, it was customary for buyers to examine individual lots and to pay different prices, based upon their appraisal of the quality of the different lots. This, in turn, led to the expression of these preferences in terms of grades when the market was being quoted. The grades in some cases represented only a general understanding among the trade of what was meant by different qualities while in other cases, particularly in such an instance as the Chicago market where poultry was sold through the Chicago Live Poultry Board, definite grades for live poultry were formulated and were available in printed form. In addition, poultry was sold by grades in the other large terminal markets, such as New York, Philadelphia, San Francisco, and St. Louis. In my experience, sale of poultry by grades has proved to be commercially necessary and sales by grades of one form or another became the general commercial practice."

There is included in the record an excerpt from the rules of the Chicago Poultry Board, above referred to, setting forth the specifications for grades 1 and 2 of live poultry.

Mr. Slocum's affidavit further recites that since 1928 the Department of Agriculture has issued Tentative U. S. Standards and Grades for Live Poultry, after consultation "with individuals and concerns engaged in the handling, buying, and selling of these commodities. A careful examination was made of commercial grades which had been drawn up for use in the various markets or sections of the country. These and the factors usually considered in the practice of grading poultry, both live and dressed, have been taken into consideration in drawing up the U. S. grades." Such standards, according to Mr. Slocum, "afford a basis for the grading of poultry in all parts of the country on a uni-

form basis and therefore provide a uniform language of quality for use by the industry." The U. S. Standards, though voluntary so far as the Department of Agriculture is concerned, have come into considerable commercial use. Mr. Slocum concludes as follows:

"In grading live and dressed poultry according to the U. S. grades for these products, the same basic factors have been taken into consideration for all sections of the country. In other words, when graded according to the U. S. standards, the same classes are used and also the same quality grades for each class. In contrast, commercial grades, specifications, and terms used in one market or one section are frequently different from those for the same classes of poultry in other markets or in other sections.

"When it became necessary to establish maximum prices for live and dressed poultry, it was, of course, necessary to think in terms of uniform standards or grades which could be applied in all sections of the country. Because of the variation which existed in commercial grades, the use of the U. S. standards and grades was both necessary and logical since these were the only grades for these products which were uniform for all sections of the country."

There is also in the record an affidavit by H. A. Rust, another experienced employee of the Department of Agriculture, who for the past sixteen years has been actively associated with market price reporting, grading and inspection of dairy and poultry products, and who at present is Senior Marketing Specialist in the Market News Division, Dairy and Poultry Branch, Food Distribution Administration. Mr. Rust states:

"There has developed over a period of years, the trade practice of segregating poultry according to class and quality. These segregations, in the main, reflect variances in economic value and use. Such handling is a natural outgrowth of dealers' efforts to select and merchandise goods in a manner conducive to consumer satisfaction and procurement of highest possible sales returns. Trade organizations such as exist on the Chicago, St. Louis and Kansas City markets have written specifications and definitions for classes and grades incorporated into established rules for trading. This action was taken by the

478

St. Louis Butter, Egg and Poultry Exchange in 1917, by the Kansas City Mercantile Exchange in 1924, and by the Chicago Poultry Board in 1934. Other larger markets, which may not have them in writing, do have through usage and custom a practical understanding of classes and grades in practice.

"Price reporting agencies, commercial and Government, have for a number of years reflected by prices reported, that sales were made according to class and quality. Commercial market reporting agencies such as Urner Barry of New York, Price Current of Chicago and Philadelphia Record of Philadelphia have been reporting poultry on the basis of class and grade for years, although only Chicago has official poultry board trading rules. Similarly, Government reporters at San Francisco and Philadelphia in reporting prices, adopted the unwritten class and grade terminology peculiar to the local trade.

"Experience would indicate that some sort of understanding as to class and quality between buyers and sellers is prerequisite to a sale of poultry. Likewise, frequency of sales on any particular market eventually results in crystallization of ideas with respect to the desired requirements of each class and grade. In some instances these requirements may be written into the official rules of a trade organization, while elsewhere they may follow well established custom."

■ Complainants object that these affidavits confuse and intermingle the dressed poultry industry with the live poultry industry. We find no such confusion in the affidavits. Complainants also object that these affidavits are "biased" and "prejudiced", presumably on the ground that they were made by Government employees. The Administrator was clearly entitled to give weight to these affidavits. See Rabkin v. Bowles, Em.App.1944, 143 F.2d 600, 601, and cases cited. If anything, these affiants were more entitled to credence on the score of disinterestedness than complainants' own counsel, whose affidavits constituted the sole evidence offered by complainants.

The record also includes an excerpt from an "Economic Survey of the Live-Poultry Industry in New York City", by Gordon W. Sprague, Alexander Sturges and James H. Radabaugh (U. S. Department of Agriculture, Miscellaneous Publication No. 283, August 1937). This survey takes issue with the contention that it is impossible or impracticable to apply grading specifications to live poultry, and states that "the dealers themselves, while arguing against the use of such grades, attempt to apply them but do it in such a way that the results do not simplify the marketing process but rather confuse it." Changing terminology for grades and classes of live poultry in commercial usage is a "source of confusion in the price structure of the New York market." The survey goes on to say: "No single reform in the business would probably yield so many desirable results as the adoption of a set of standards and grades for live poultry and its administration by a disinterested agency."

It appears that in 1942 the Department of Markets, New York City, promulgated rules and regulations adopting the U. S. Standards for the required grading of live poultry in the New York terminal market. A lower court enjoined the enforcement of these regulations at the suit of Avon Western Corporation, one of the complainants herein, but on appeal this decision was reversed by the Appellate Division on the ground that the regulations were a valid exercise of the police power as "part of a program that aims to wipe out unfair trade practices in the live poultry industry." Avon Western Corp. v. Woolley, 1943, 266 App.Div. 529, 42 N.Y.S.2d 690, 695, affirmed 291 N.Y. 687, 52 N.E.2d 587.

In his opinion accompanying the order denying the protest, the Administrator reexamined the matter in the light of the materials in the record and reaffirmed his determination "that there is no practicable alternative for effective price control of live poultry except in terms of specifications", as prescribed in the regulation. He pointed out that the regulation "presents a carefully planned price structure which correlates the prices of live and dressed poultry and permits the poultry processor to resell the product at maximum prices." Further, he stated: "The Price Administrator, in issuing maximum price regulations, must consider an industry as a whole, not one segment of it. In the industry at large most poultry is sold for processing not for resale as live poultry. The sale of processed poultry by grades was the general industry practice prior to price control, which the Regulation adopted.

Protestants have made no objection to setting maximum prices for dressed poultry in terms of grades, yet the relation between the prices of live and dressed poultry and the fact that dressed poultry is sold by grade, is a further consideration which requires that live poultry prices likewise be fixed by grade. Since the processor is required to sell his product by grades, he would be subjected to great and unfair hardship if his supplier were permitted to sell without grades and under present market condition [sic] could demand Grade A prices for Grade C fowl."

The Administrator rejected the alternative suggested by complainants that a single maximum price should be set for each class of poultry items, with no price differentials based upon differences in quality, leaving the maintenance of such a differential to the operation of the law of supply and demand. In this connection, the Administrator said: "Protestants in their suggestion that the law of supply and demand be given free play overlook the fact that the present market is abnormal and that the normal checks provided by the law of supply and demand no longer suffice to restrain rising prices. In the same way the ever-growing shortage of poultry for civilian consumption coupled with the increase in prices tends to obscure quality differentials which in normal times were reflected in price differences. Thus, for example a Grade C bird, which in normal times sold at a price commensurate with its value, can now, because of the combined pressure of shortages and excess purchasing power, be sold at the price formerly paid for a Grade A bird. It was the need to curb inflationary prices that brought about the enactment of the Emergency Price Control Act of 1942 and the imposition of maximum prices. It, likewise, was the necessity to make maximum dollars-and-cents prices for poultry effective and to curb the tendency to disregard quality as the basis for price that required the inclusion in Revised Maximum Price Regulation No. 269 of the grading provisions to which Protestants object, and justifies the determination that there is no practicable alternative to effective price control."

Attached to the Administrator's opinion were extracts from letters from various poultry associations to the effect that grading specifications for live poultry are desirable and necessary.

■ We cannot say that the Administrator's determination was irrational and without factual support in the record. Nor can we say that the extra burden which may be cast upon the industry in the application of the prescribed standards for grading live poultry is so excessive as to render the grading provisions of the regulation, as now in force, arbitrary and capricious.

Brief reference will be made to certain procedural objections offered by complainants—objections which, strictly, are not properly before us because they were not made in the protest proceedings before the Administrator.

■ It is said that the Administrator erred in not holding a public hearing before making the determination required by clause (3) of the Taft Amendment. The statute makes no such requirement. This determination is no different from other determinations which the Administrator has to make under Section 2 of the Act before issuing price and rent regulations. Under the statutory scheme, formal administrative hearings are required only at the stage of protest proceedings following the issuance of regulations. Bowles v. Willingham, 1944, 321 U.S. 503, 519, 520, 64 S.Ct. 641.

■ The finding by the Administrator embodied in Supplementary Order No. 57, above quoted, together with the Supplemental Statement of Considerations filed at the same time by the Administrator, constituted a sufficient formal compliance with the requirement of clause (3) of the Taft Amendment. See Montgomery Ward & Co. v. Bowles, Em.App.1943, 138 F.2d 669, 671; Pacific States Box & Basket Co. v. White, 1935, 296 U.S. 176, 186, 56 S.Ct. 159, 80 L.Ed. 138, 101 A.L.R. 853.

■ Nor is there any substance to the objection that the Administrator did not hold an oral hearing in the protest proceedings. Section 203(c) of the Act expressly provides that such proceedings may be "limited by the Administrator to the filing of affidavits, or other written evidence, and the filing of briefs." Moreover, complainants made no request for an oral hearing as they were permitted to do by Section 39 of the Administrator's Revised Procedural Regulation No. 1. See Yakus v. United States, 1944, 321 U.S. 414, 436, 64 S.Ct. 660.

The issues in the protest proceeding were clearly drawn, and complainants were afforded ample opportunity to rebut the economic data and other facts incorporated into the record by the Administrator. We cannot see how Morgan v. United States, 1938, 304 U.S. 1, 58 S.Ct. 999, 82 L.Ed. 1129, cited by complainants, offers any support to them in this case.

The complaint is dismissed.