**THOMAS PAPER STOCK CO. et al. v. BOWLES, Price Administrator.**

No. 159.

United States Emergency Court of Appeals. Heard at Chicago Nov. 30, 1944.

Decided March 27, 1945.

Writ of Certiorari Granted June 4, 1945.

See 65 S.Ct. 1409.

Jack H. Oppenheim, of Chicago, Ill. (David L. Bazelon, of Chicago, Ill., on the brief), for complainants.

Nathaniel L. Nathanson, Associate Gen. Counsel, of Washington, D. C. (Richard H. Field, Gen. Counsel, Jacob D. Hyman, Chief, Court Review Price Branch, and Josephine H. Klein, Atty., all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and LINDLEY and LAWS, Judges.

MARIS, Chief Judge.

On June 15, 1944 the complainants filed a protest with the Price Administrator against Maximum Price Regulation No. 30, Wastepaper, as applied to unsorted wastepaper dealt in by them. Their protest was denied on July 29, 1944 and on August 26, 1944 they filed their complaint in this court. On December 17, 1943 the complainants had been indicted in the United States District Court for the Northern District of Illinois for violations of MPR 30. On June 29, 1944 the Price Administrator instituted against the complainants in that court a civil action for treble damages and an injunction. Both proceedings involved sales of unsorted wastepaper alleged to have been made between July 16th and September 11, 1943 at more than the maximum price fixed by MPR 30. Both proceedings are still pending.

Maximum Price Regulation No. 30[1] established ceiling prices for wastepaper. Subsection (d) of Section 1347.14 of the Regulation established ceiling prices for unsorted wastepaper. It is this provision of the Regulation to which complainants' protest was directed. In its present form[2] Section 1347.14(d) reads:

"The maximum prices for sales of unsorted wastepaper to any person shall not exceed the maximum price prescribed by this regulation for 'No. 1 mixed paper,' regardless of the grades and quantity of each grade contained in such unsorted wastepaper."

The complainants protested Section 1347.14(d) upon two grounds. Both are based upon the fact that the section fixes the maximum price for a type of wastepaper, unsorted wastepaper, in terms of a specification or standard, "No. 1 mixed paper",[3] and that for this reason the provision runs afoul of Subsection (j) of Section 2 of the Emergency Price Control Act of 1942, known as the Taft amendment, which was enacted on July 16, 1943.[4] The subsection reads as follows:

" (j) Nothing in this Act shall be construed (1) as authorizing the elimination or any restriction of the use of trade and brand names; (2) as authorizing the Administrator to require the grade labeling of any commodity; (3) as authorizing the Administrator to standardize any commodity, unless the Administrator shall determine, with respect to such standardization, that no practicable alternative exists for securing effective price control with respect to such commodity; or (4) as authorizing any order of the Administrator fixing maximum prices for different kinds, classes, or types of a commodity which are described in terms of specifications or standards, unless such specifications or standards were, prior to such order, in general use in the trade or industry affected, or have previously been promulgated and their use lawfully required by another Government agency."

The first objection which was asserted by the complainants in their protest to support their contention that the Regulation is invalid is based upon the legal premise that the Administrator is prohibited by the Taft amendment from establishing maximum prices by the use of a standard or specification in the absence of one of the two conditions described in clause (4) of Section 2(j). They reason that clauses (3) and (4) of Section 2(j) are to be construed as wholly separate and independent provisions, that clause (4) absolutely prohibits the use of specifications or standards in connection with the fixing of maximum prices unless they

---

[1] Issued November 21, 1942, 7 F.R. 9732.

[2] As amended December 28, 1943, 8 F.R. 17483.

[3] The specifications for No. 1 mixed paper are given in the Regulation.

[4] By Section 5(a) of Joint Resolution of July 16, 1943, 57 Stat. 566, 50 U.S. C.A.Appendix § 902(j).

(a) were prior to the Regulation "in general use in the trade or industry affected" or (b) "have previously been promulgated and their use lawfully required by another Government agency." They assert that the section of the Regulation under attack involves the use of a specification or standard within the meaning of Section 2(j), that prior to the Regulation the specification or standard in question was not in general use in the wastepaper industry and that it had not previously been promulgated and its use required by another Government agency.

The Administrator's answer to the complainants' contention is that, conceding the facts to be as asserted by the complainants,[5] there is a third situation in which Section 2(j) authorizes him to make use of specifications or standards for the purpose of fixing maximum prices. This, he says, is the situation described in clause (3) of Section 2(j), which clause expressly authorizes him to standardize a commodity if he determines that no practicable alternative exists for securing effective price control with respect to such commodity. It is the Administrator's contention that clauses (3) and (4) of Section 2(j) are to be read together as providing three alternative situations in any one of which he is authorized to employ specifications or standards in connection with price control.

The construction which the Administrator seeks to place upon Section 2(j) was assumed in Avon Western Corporation v. Bowles, Em.App., 1944, 145 F.2d 473, and in United States v. Pepper Bros., 3 Cir., 1944, 142 F.2d 340. We think it is correct. While it is true that clauses (3) and (4) are arranged in the subsection in the disjunctive and are, therefore, susceptible to the construction sought to be placed upon them by the complainants we are satisfied that such a construction would leave clause (3) without any practical meaning or effect. For the Administrator's function is to control prices— not to standardize commodities. Any standardization of commodities in which he indulges may only be in connection with and for the purpose of making more effective his control of prices. Therefore, if clause (3) is construed merely to authorize him to establish standards but not to apply them to practical use in his price control regulations it is wholly meaningless. Indeed the complainants frankly admit that this will be the result if we accept their contention that the Administrator may not utilize a standard for price control, unless one of the conditions described in clause (4) is present. Such a construction would clearly violate one of the primary canons of statutory construction.[6]

In fact clause (3) bears internal evidence that the standardization which it authorizes the Administrator to make was intended to be used in connection with price control. The authority which the clause gives to take such action is expressly limited to those cases where there is no other practicable alternative for effective price control. The inference is plain that the standardization when authorized is to be employed in order to secure effective price control.

Moreover the construction of the two clauses which is contended for by the Administrator is amply supported by the legislative history of the Taft amendment. Shortly before the enactment of the amend-

5 In his supplementary statement of considerations to Maximum Price Regulation No. 30, issued September 11, 1943, the Administrator said: "In one respect, Maximum Price Regulation No. 30 may be deemed to effectuate a standardization not heretofore known in the industry. Section 1347.14(d) provides that the maximum price for unsorted paper sold to a consumer shall not exceed the maximum price prescribed by the regulation for 'No. 1 mixed paper'. This was not the practice in the industry prior to price control. Prior to price control, unsorted paper was rarely sold to a consumer, but whenever it was the price varied depending upon the materials contained in the lot of unsorted paper. Maximum Price Regulation No. 30 penalizes sellers upon their sales of unsorted paper to a consumer. This provision affects a very small percentage of the industry's total volume and is absolutely necessary in order to secure effective price control with respect to wastepaper."

Pike and Fischer OPA Price Service, Building Materials & Paper, Vol. 1, pp. 20135-20137.

6 "A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error." 2 Sutherland Statutory Construction, 3rd Ed., § 4705.

ment a proviso had been inserted in the National War Agency Appropriation Act, 1944,[7] which made appropriations for the Office of Price Administration. The proviso was as follows:

"Provided further, That no part of this appropriation shall be used for the promulgation or enforcement of orders requiring grade labelling or standardization of food products, wearing apparel or other processed or manufactured commodities or articles."

Immediately after the enactment of this proviso the Administrator raised the question that it would be too drastic in its effect upon existing price regulations in which he had utilized standards for price control purposes. His views in this regard having been communicated to the Committee on Banking and Currency of the Senate, the Committee proposed to the Senate that it add to a joint resolution which was then under consideration an amendment which would modify and clarify the ban upon grade labeling and standardization contained in the Appropriation Act which had just been passed. The amendment proposed by the Committee would have added to Section 2 of the Emergency Price Control Act a new subsection (j) as follows:

"Nothing in this Act shall be construed, (1) as authorizing the elimination of trade and brand names; (2) as authorizing the Administrator to require the grade labeling of any commodity; or (3) as authorizing the Administrator to standardize any commodity unless the Administrator shall determine with respect to such standardization that no practicable alternative exists for securing effective price control with respect to such commodity, but no order of the Administrator shall be deemed to require standardization because it fixes maximum prices, for different kinds, classes or types of a commodity, which are described in terms of specifications or standards, if such specifications or standards were prior to such order in substantial use in the trade or industry affected or have been established by another Government agency."

When this proposed amendment came up for consideration in the Senate Senator Taft offered on the floor a substitute amendment in the exact phraseology of subsection (j) as finally enacted and his substitute was adopted in lieu of the committee amendment. In this connection Senator Taft stated to the Senate:

"Mr. Taft. Mr. President, as the Senate will remember, in one of the appropriation bills we included a very tight provision against grade labeling and the elimination of trade names. The amendment was inserted on the floor of the House. The language used was not very apt for the purpose.

"Price Administrator Brown came before the committee and urged that it would seriously hamper his price regulations in a number of trades, regulations for which had already been issued, to many of which there was no objection. He submitted another form of amendment, carrying out the same purpose, but making it perfectly clear that it would not interfere with those regulations, which are proper.

"That amendment was submitted to those in the House who drafted the original amendment. It was submitted to the representatives of the canners, who had strenuously objected to the effort to eliminate grade names. The amendment as I now offer it is only slightly different from the committee amendment. It meets with the agreement of the Price Administrator and of all the trades which have been directly interested."[8]

Under the language of the committee amendment, which was superseded by the Taft amendment, it is quite clear that the Administrator could have employed standards if he found that no practicable alternative existed for securing effective price control with respect to a given commodity even though such standards had never before been used by the industry or prescribed by another Government agency. Senator Taft assured the Senate that his substitute was "only slightly different" from the committee amendment. Following his statement his amendment was substituted and adopted. The difference between the two amendments which is now suggested by the complainants is a fundamental one which the legislative history demonstrates was not contemplated by the Senator who proposed the amendment or by the Congress which adopted it.

█ It must, therefore, be concluded that the Taft amendment did not invalidate Section 1347.14(d) of MPR 30 merely be-

---

[7] 57 Stat. 522, 526.

[8] 89 Cong.Rec. 7327, July 6, 1943.

cause the specification or standard employed by that section had not previously been used by the wastepaper industry or required by another Government agency.

The complainants asserted a second objection in their protest. It was that even if clause (3) of Section 2(j), the Taft amendment, be construed as authorizing the Administrator to employ specifications or standards for the purpose of fixing maximum prices of a commodity whenever he determines that no practicable alternative exists for securing effective price control with respect thereto, the fact is that in the present case he did not make such a determination until September 11, 1943 [9] Consequently, they say, Section 1347.14(d) of MPR 30 was by force of the Taft amendment invalid and ineffective between July 16, 1943, the date of enactment of that amendment, and September 11, 1943, the date of the Administrator's determination. This, it will be recalled, was the period during which the complainants are alleged in the pending enforcement proceedings to have violated the Regulation. For the purposes of this objection the complainants concede that Section 1347.14(d) became valid and unassailable after September 11, 1943, by reason of the Administrator's formal determination that the use of the standard in question was necessary because no practical alternative existed for securing effective price control with respect to wastepaper.

■ We think that this objection was not available to or properly included by the complainants in their protest to the Administrator because it involved a ground of invalidity which did not exist when the protest was filed, having admittedly been corrected and cured by the Administrator more than nine months previously.

■ The protest procedure which the complainants followed in this case was provided for by Section 203 of the Emergency Price Control Act, 50 U.S.C.A. Appendix § 923. Its primary purpose is to afford to a person subject to a provision of a regulation or order which he believes to be invalid the opportunity to present his objections thereto to the Administrator and to request its modification or rescission in order that he may not have to obey it in the future. This is not to say that in a protest attacking the validity of a regulation or order and asking for its modification or rescission for the future the protestant may not also ask that the relief thus requested be made retroactive so as to be available for his defense in an enforcement proceeding. Nor is it to say that the Administrator may not grant such a request in a proper case. On the contrary the Administrator has assumed that he has the power to give retroactive effect to the modification or revocation of a regulation [10] and he has actually exercised the power to do so.[11] What we do say is that this power is purely incidental to the Administrator's

---

[9] On September 11, 1943, the Administrator issued Supplementary Order No. 64 (8 F.R. 12554) by which he amended the preamble to MPR 30 by adding thereto the following sentence: "Insofar as this regulation uses specifications and standards which were not, prior to such use, in general use in the trade or industry affected, or insofar as their use was not lawfully required by another Government agency, the Administrator has determined, with respect to such standardization, that no practicable alternative exists for securing effective price control with respect to the commodities subject to this regulation."

[10] Supplementary Order No. 40 issued by the Price Administrator (8 FR 4325, OPA Service—1 Gen., 8351) provides in part: "The repeal, revocation, amendment or other modification of a price regulation or any part thereof shall not have the effect to release or extinguish any penalty or liability incurred under such price regulation *unless otherwise*

*expressly provided* but such price regulation or part thereof shall be treated as remaining in force for the purpose of allowing or sustaining any proper suit, action, prosecution or proceeding with respect to such penalty or liability." (Emphasis supplied.)

In his statement of considerations (OPA Service—1 Gen., 8355) the Administrator said that this order was issued "to make it clear that changes in price regulations do not, *unless otherwise expressly provided*, release or extinguish any penalty or liability incurred prior to the changes." (Emphasis supplied.)

[11] See for example Supplementary Order No. 7, 7 FR 5176, OPA Service—1 Gen., 8141, and Supplementary Order No. 35, 8 FR 1449, OPA Service—1 Gen., 8321. See also MPR 425, Amendment No. 11, 9 FR 13857, OPA Service—1 Food, 6538; MPA 425, Amendment No. 12, 9 FR 14437, OPA Service—1 Food, 6539; MPR 493, Amendment No. 5, 9 FR 2288, OPA Service—1 Food, 13,837.

power to deal with an existing regulation and that it cannot be invoked by a protest which merely requests retroactive relief based upon an objection to a regulation which has already been met by its modification or rescission. The duty imposed upon the Administrator by the Act is to establish and maintain price and rent regulations which are generally fair and equitable and which effectuate the purposes of the Act to stabilize prices and rents and to control inflation. If the Administrator finds that ·a regulation does not meet the statutory standards it is his duty to modify or rescind it and if necessary to substitute another one which does meet those standards. In performing this duty he may, if appropriate, make his action retroactive. The Act, however, does not contemplate that he may be wholly diverted from his all important administrative task of price control for the sole purpose of performing the unrelated judicial task of determining the effect of past regulations upon the rights and liabilities of private individuals.

The fact that the limitation of sixty days imposed by the original Act upon the filing of a protest did not apply to a protest such as the one now before us which was based upon new grounds arising after the issuance of the regulation, as we held in R. E. Schanzer, Inc. v. Bowles, Em.App., 1944, 141 F.2d 262, does not mean that there is no limitation whatever upon the time within which an objection to a regulation or order must be presented to the Administrator in a protest. On the contrary, as we have seen, the very nature of the protest procedure involves such a limitation. Accordingly when the Act as it has now been amended, provides that "At any time after the issuance of any regulation or order * * * any person subject to any provision of such regulation, order * * * may * * * file a protest specifically setting forth objections to any such provision * * *." it must be construed to mean that a protest setting forth an objection to a provision of a regulation or order may be filed at any time while the protested provision is still in force and open to the objection and is thus subject to modification or rescission by the Administrator as requested by the protestant if the objection is found to be well taken. Any other con-

struction would lead to the result that a protest might be filed under the Act after it was too late to secure any action upon the objection which it raises, an obviously futile procedure.

It follows that the second objection relied upon by the present complainants was not presented to the Administrator in a protest filed in time to enable him to consider and act upon it. Being thus untimely the Administrator properly refused to grant the complainants' request for retroactive relief based upon it. Moreover because the objection was not timely presented to the Administrator it may not be considered by this court in support of the present complaint. That complaint was filed under Section 204(a), 50 U.S.C.A.Appendix § 924(a), by the express terms of which this court may not consider any objection urged in support of the complaint unless the objection was set forth by the complainant in the protest.[12] This can only mean an objection properly and timely set forth in a protest so that the Administrator has power to act upon it; not an untimely objection which presents no present question with respect to any existing regulation or order. For, as we have indicated, Sections 203 and 204 disclose the statutory intent that the protest procedure is to be used only with respect to subsisting regulations and orders and then only to raise objections with respect to which the Administrator may still grant prospective relief.

It does not follow, however, that the complainants by their failure to file a timely protest with respect to their second objection have lost the possibility of securing retroactive relief based upon that objection if they can show good faith and excuse their delay in presenting it. All courts of the United States are empowered by the Declaratory Judgments Act, Section 274d of the Judicial Code,[13] to declare rights and other legal relations of a complainant with respect to a party and a subject matter within their jurisdiction, whether or not further relief is or could be prayed. The Stabilization Extension Act of 1944 by its addition of subsection (e) to Section 204 of the original act has made it clear that this court may exercise the power thus conferred to make a deter-

[12] Sec. 204(a) of the Emergency Price Control Act provides that "No objection to such regulation, * * * shall be considered by the court, unless such objection shall have been set forth by the complainant in the protest * * *."

[13] 28 U.S.C.A. § 400.

mination as to the validity of a regulation or order which will have retroactive effect as of a time in the past when the regulation was alleged to have been violated. This appears from the following provision of Section 204(e):

"If any provision of a regulation, order, or price schedule is determined to be invalid by judgment of the Emergency Court of Appeals which has become effective in accordance with section 204(b), any proceeding pending in any court shall be dismissed, and any judgment in such proceeding vacated, to the extent that such proceeding or judgment is based upon violation of such provision." [14]

Paragraph (1) of Section 204(e) affords a remedy to a person who has excusably failed to present an objection to a regulation by way of protest while the regulation was in force and open to the objection but who nevertheless shows that he needs for his defense in an enforcement proceeding a determination of the validity of the regulation as of the time when he is charged with having violated it. The paragraph

---

[14] The scope of the quoted provision is not cut down by the final clause of subsection (e) to the effect that "except as provided in this subsection" no retroactive effect shall be given to any judgment setting aside a provision of a regulation, order or price schedule. The only provision for such retroactive effect which is contained in the subsection is the one quoted in the text and it must, therefore, be the one referred to in the final clause as excepted from its prohibition against retroactive effect.

The legislative history of the Stabilization Extension Act demonstrates that this is the proper construction to be placed upon the final prohibitory clause of subsection (e). The clause first appeared in the Senate bill (S. 1764, 78th Cong. 2d Sess.) in connection with a provision for retroactive effect which was limited to criminal cases. The pertinent language of subsection (e) as proposed by that bill was as follows:

"If any provision of a regulation, order or price schedule is determined to be invalid by judgment of the Emergency Court of Appeals which has become effective in accordance with section 204(b), any *criminal* proceeding pending in any court shall be dismissed, and any judgment in such proceeding vacated, to the extent that such proceeding or judgment is based upon violation of such provision. Except * * * ; nor, except as provided in this subsection, shall any retroactive effect be given to any judgment setting aside a provision of a regulation or order issued under section 2 or of a price schedule effective in accordance with the provisions of section 206." (Emphasis supplied.)

The final prohibitory clause of this Senate version of subsection (e) was quite obviously intended to make clear that the judgments of this court should not be given retroactive effect in civil enforcement proceedings for injunctions or treble damages or in any other case except a criminal proceeding for violation of a provision of a regulation or order determined by this court to be invalid.

In the bill as passed by the House of Representatives the provision of the proposed subsection (e) for retroactive effect was made applicable to any proceeding or judgment, civil or criminal, based upon violation of a provision of a regulation, order or price schedule determined by this court to be invalid and the final prohibitory clause of the Senate bill was omitted as unnecessary. In the bill as agreed on in conference between the two houses and as finally enacted the broad provisions of subsection (e) for giving retroactive effect to judgments of this court in all enforcement proceedings, civil as well as criminal, which the House of Representatives had adopted, were retained. The final prohibitory clause of the Senate bill was also included, however. No reason for including it was given, either in the statement made by the House conferees in the conference report (House Report 1698, 78th Cong. 2d Sess.) or in the statement made by Senator Wagner, the chairman of the Senate conferees, on the floor of the Senate in explanation of the conference report (90 Cong. Rec. pp. 6449–6452). In the absence of any other explanation it must be presumed that the conferees thought it useful to retain the prohibitory clause for reasons similar to those which brought about its original inclusion in the Senate bill in the first place, namely, in order to make clear that the judgments of this court should not be given retroactive effect in any judicial proceeding except those in which such effect was expressly authorized to be given by the preceding provision of the subsection. While those proceedings had been broadened to include all enforcement proceedings, civil as well as criminal, the conferees may well have had in mind that a judgment of this court determining a regulation or order to be invalid might be sought to be given retroactive effect in pending private litigation or even in the interpretation or enforcement of an existing private contract.

provides that within the periods of time which it stipulates a defendant in any civil or criminal proceeding involving an alleged violation of any price or rent regulation or order may apply to the court in which the proceeding is pending for leave to file in this court a complaint setting forth objections to the validity of any provision which the defendant is alleged to have violated. It is further provided that the court in which the proceeding is pending shall grant such leave with respect to any objection which it finds is made in good faith and with respect to which it finds there is reasonable and substantial excuse for the defendant's failure to present such objection in a protest filed in accordance with Section 203(a).

In Montgomery Ward & Co. v. Bowles, Em.App., 147 F.2d 858, the jurisdiction of this court was invoked by a complaint filed under Section 204(a) following the denial of a protest and while the protested regulation was still in force. We held in that case that this court had power to make a declaration as to the validity of the regulation in question at the request of the complainant who had been charged with having violated it even though because of the revocation of the regulation by the Administrator while the complaint was pending we no longer could grant affirmative relief with respect to it. This court has like power to determine the validity of a regulation which a complainant is alleged to have violated when its jurisdiction is invoked by a complaint filed under Section 204(e) (1) with leave of court. In either case if the determination of this court is that the provision is invalid Section 204(e) requires that the enforcement proceeding pending against the defendant shall be dismissed and any judgment entered against him shall be vacated to the extent that such proceeding or judgment is based upon violation of the provision determined to be invalid.

It may be suggested that the remedy afforded by Section 204(e) (1) is not available to the present complainants with respect to the civil action pending against them because that section refers only to a situation in which the defendants in an enforcement proceeding have not presented their objection to the Administrator in a protest filed prior to the institution of the proceeding against them whereas the complainants did present their objection in such a protest. The answer to such a sug-

gestion is that when the section speaks of "the defendant's failure to present such objection in a protest filed in accordance with section 203(a)" it refers to the presentation to the Administrator in a protest of an objection to an existing regulation or order in time to permit the Administrator to grant relief to the protestant with respect to the objection and not to an untimely objection as in the case now before us. Since, as we have seen, the present complainant's second objection had already been met and cured by the Administrator before it was presented to him in the protest filed on June 15, 1944, the complainants, so far as concerns the remedy afforded by Section 204(e) (1), are in the same position as though they had never presented that objection to the Administrator in a protest.

The construction which we have thus placed upon the provision in Section 204(e) (1) requiring the showing of a "reasonable and substantial excuse for the defendant's failure to present such objection in a protest" gives a rational meaning in harmony with the general scheme of the Emergency Price Control Act as amended by the Stabilization Extension Act to a provision which if literally construed would operate most unjustly. For if the provision were to be construed literally it would deprive defendants in the situation of these complainants with respect to the civil action pending against them of any opportunity to procure an adjudication of the invalidity of the regulation even though they were able to show good faith and due diligence. For their filing of a protest after the invalidity of the regulation had been cured by modification or rescission, although not enabling them to secure relief from the Administrator or on review from this court, would nevertheless bar them from making application for the right to secure relief in this court under Section 204(e) (1).

We cannot think that Congress intended any such result. On the contrary the Act as amended may fairly be construed to afford a comprehensive and well rounded plan of procedure for obtaining relief against invalid provisions of regulations and orders of the Administrator. It may be helpful at this point to outline the scope of that procedure as we understand it.

For a person subject to an invalid provision of a regulation or order who has complied with it in the past but desires to have it set aside prospectively the pro-

test procedure of Section 203 is available. He may by protest bring his objections to the attention of the Administrator and seek relief from that official by way of modification or rescission of the regulation or order in question. If the Administrator denies him relief he may invoke the jurisdiction of this court under Section 204(a) to set the regulation or order aside in whole or in part.

A person subject to an invalid provision of a regulation or order who has violated it in the past and who is, therefore, subject to enforcement proceedings, whether or not actually instituted, may wish in addition to prospective relief to have a determination of the validity of the provision as of the time he violated it in order to establish the defense of invalidity in the enforcement proceedings brought or threatened against him. A person who desires to institute proceedings to establish the invalidity of the provision of the regulation or order may find himself in one of the three following situations: (1) the provision of the regulation or order which he has violated may still be in force and open to the objection which he seeks to raise but enforcement proceedings may not yet have been actually instituted against him; (2) the provision of the regulation or order which he has violated may still be in force and open to the objection which he seeks to raise and enforcement proceedings may have been actually instituted against him; or (3) the provision of the regulation or order which he has violated may no longer be open to the objection which he seeks to raise because it has been modified or rescinded but enforcement proceedings have been or may still be instituted against him.

In the first class of cases the person who desires an opportunity to establish the invalidity of the provision of the regulation or order for purposes of his defense may have that opportunity in a protest proceeding brought under Section 203 to be followed if necessary by a complaint in this court under Section 204(a). While such a protest proceeding must, as we have seen, primarily be directed toward securing prospective relief against the provision of the regulation or order alleged to be invalid by its modification or rescission, the protestant may ask to have that relief made retroactive, and the Administrator may grant his request. If upon such a request the Administrator should refuse to give retroactive relief even though giving relief for the future his action would be a partial denial of the protest which would open the way for the filing of a complaint under Section 204(a) upon which we would be empowered to grant retroactive relief by way of a declaratory judgment. Accordingly in this class of cases retroactive relief may be obtained from the Administrator upon a proper showing in a protest proceeding or, if he denies it, such relief may be obtained from this court in a proceeding under Section 204(a).

In the second class of cases the person who seeks to establish the defense of invalidity has the choice of two remedies. He may as of right but without staying the prosecution of the enforcement proceeding follow the protest and review procedure of Sections 203 and 204(a) which we have already described, or if he desires to secure a stay of the prosecution of the enforcement proceeding he may make application to the court in which that proceeding is pending for leave to file a complaint in this court under Section 204 (e) (1) without having previously filed a protest.

A person who finds himself in the third class of cases may, after an enforcement proceeding has actually been instituted against him, make application for leave to file a complaint in this court under Section 204(e) (1). He is, however, restricted to that remedy since by his failure to raise the question of validity in a protest filed while the regulation or order was in force and open to the objection which he seeks to raise, he has lost the right to secure relief through the protest and review procedure of Sections 203 and 204(a). This is because the Stabilization Extension Act has not changed the primarily prospective nature of the protest procedure of Section 203. Moreover such a person may only request leave to file a complaint under Section 204(e) (1) after an enforcement proceeding is actually commenced against him. Since in such a case the regulation or order is no longer open to his objection there is no need to litigate its past validity unless an enforcement proceeding makes it necessary to decide the question.

Under the statutory procedural plan which we have outlined it is clear that the complainant's first objection falls within the first class while their second objection falls within the third class. It follows that in this proceeding brought upon the

denial of complainants' protest we have power to consider and dispose of complainants' first objection upon the merits, as we have done, but that we do not have similar power with respect to the second objection. We may consider that objection upon its merits only if and when a complaint asserting it is filed under Section 204(e) (1) with leave of the United States District Court for the Northern District of Illinois after the complainants satisfy that court that the objection is asserted in good faith and that there is reasonable and substantial excuse for the complainants' failure to present it in a protest filed before September 11, 1943. In view of the doubt which has existed as to the timeliness of the presentation of this objection in the protest filed June 15, 1944 it is quite clear that the District Court would be abundantly justified in finding that the complainants have such an excuse.

A judgment will be entered dismissing the complaint.

＊

LINDLEY, Judge (concurring).

I concur with Judge MARIS' opinion. However, in view of Judge LAWS' dissent I deem certain observations pertinent. It may well be that under the facts presented here complainants would have had no remedy as to their second objection before the enactment of the Stabilization Extension Act of 1944 and, thus, as Judge LAWS indicates, if our conclusion is correct, would have had cause to assert deprivation of due process. However, it seems to me, Congress has remedied this situation by incorporating Section 204(e) (1) into the Act, thereby creating a remedy to which we properly remand complainants.

My thought in this respect results largely from the whole tenor of the legislative history of the various provisions of the Stabilization Extension Act of 1944 which brought into the Price Control Act Section 204(e) (1), 50 U.S.C.A. Appendix § 924 (e) (1). That history, as reflected by the annals of the committees and the debates in both Houses, seems to me to demonstrate clearly that the members of Congress, fearful lest, in the emergency facing them when they enacted the original legislation, which was intended to forestall inflation and to bring about stabilization of our economy in wartime, they had imperilled certain constitutional rights, sought to remove the threatening possibilities. As a result came the Stabilization Extension Act with its modifications of the original act and amendments thereto. By this legislation Congress put into formal expression its attempt to banish the threat of evil and at the same time not to impair the protection of the public welfare contemplated by the original act. Thus in the Senate Senator Danaher, after directing that body's attention to the fact that in the then recent opinion of Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 678, 88 L.Ed. 834, the Supreme Court had remarked that it had "no occasion to decide whether one charged with criminal violation of a duly promulgated price regulation may defend on the ground that the regulation is unconstitutional on its face" and that it did not determine "whether one who is forced to trial and convicted of violation of a regulation, while diligently seeking determination of its validity by the statutory procedure may thus be deprived of the defense that the regulation is invalid," said: "in what we have done we have perfected the two points as to which the Supreme Court has entered no decision, to the end that there can be no question of the denial of or the existence of due process."

I believe the proper conclusion to be that after a complete survey of the original act, full disclosure as to its possible defects and exhaustive discussion as to how best to avoid them, Congress enacted the amendments, intending to assure one in the position of complainants a right to be heard; that if, previously, complainants had no forum where they could present their second objection, they now enjoy such a right, by virtue of Section 204(e) (1) and that we have jurisdiction solely by way of the avenue of approach provided therein.

LAWS, Judge (dissenting in part).

I concur in the Court's disposition of the first objection set forth in complainants' protest, but dissent from that part of the opinion which decides that the second objection raised by complainants in their protest may not be considered in this case. The ruling of the Court, as I read it, is that notwithstanding a protest includes a claim of invalidity which, if sustained, might have a bearing upon the rights and liabilities of a protestant, such claim may not be passed upon by the Administrator in any case where at the time the protest was filed the regulation was not open to the objection sought to be raised. The reasoning is that the primary purpose of the

protest proceeding is to afford prospective relief against control imposed upon prices, that while in some cases the Administrator may grant retroactive relief, such relief is purely incidental and the Act does not contemplate that the Administrator "may be wholly diverted from his all important administrative task of price control for the sole purpose of performing the unrelated judicial task of determining the effect of past regulations upon the rights and liabilities of private individuals." The right to claim this so-called "incidental" relief is recognized by the Court if at the time the protest was filed the regulation was open to the objections raised, but this right apparently is held to be cut off if the Administrator removes the basis of objection before a protest is filed.

We are dealing in this case with a question of interpreting the protest provisions of the Emergency Price Control Act of 1942, as they were when complainants filed their protest. Complainants' protest was filed before the enactment of the Stabilization Extension Act of 1944, by which the Emergency Price Control Act of 1942 was amended. The amending Act, as I understand my brethren agree, brought about no change in the nature of the protest proceeding; but simply gave to District Courts and others in which enforcement actions were brought the right to authorize a defendant to file a complaint in this Court setting forth any objection found to be made in good faith and with respect to which the court should find there is reasonable and substantial excuse for the defendant's failure to present such objection in the regular protest procedure. Such an added right obviously can have no bearing upon the proper interpretation of the protest procedure of the Emergency Price Control Act of 1942 prior to its amendment.

I do not agree with the interpretation of the Court that the protest procedure was created by Congress to provide relief against future controls of prices, to the exclusion of other rights and liabilities of individuals. Such rights and liabilities might be of importance equal to, if not greater than, the right to be relieved of price controls. Frequently a regulation has interfered with and has stricken down contracts affecting a protestant. In some instances, as in the case before us, enforcement proceedings, in the form of indictments for criminal violation of a regulation, suits to impose treble damages and suits for injunction, have been brought and are pending against a protestant. This Court is the only forum in which the invalidity of the regulation may be established. If not established in this Court, the possible effect of the invalidity of the regulation upon the rights and liabilities of the protestant may not be passed upon in other courts. The right to protest and obtain judicial review of regulations and orders issued by the Administrator was given for the benefit of individuals. I cannot believe Congress intended to give such benefit in respect only of future controls of prices and exclude the right to protest against past controls which might vitally affect rights and liabilities of individuals. I find nothing in the language of the Emergency Price Control Act of 1942 which so limits the protest and review procedure.

If it could be said without question that under the original Emergency Price Control Act of 1942 a judgment of invalidity would have had no significance in determining the rights and liabilities of a protestant, arising before the protest was filed, my position in this case might be different. But it seems to me a judgment of invalidity well might have affected, indeed in some instances might have determined, some of such rights and liabilities.[1] As applied to the case before us it might have had such effect. I recognize that in an opinion of the United States Circuit Court of Appeals for the First Circuit, it was held that the invalidity of a regulation a defendant was charged with violating might not be decided in a criminal prosecution. Rottenberg v. United States, 1 Cir., 1943, 137 F.2d 850; affirmed sub nom. Yakus v. United States, 1944, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834. But in that case the Court was not confronted with the question as to what effect a judgment of invalidity by the Emergency Court of Appeals would have if offered as a defense in a criminal case. The opinions of the Circuit Court of Appeals and the Supreme Court expressly left open the question of the right of a defend-

---

[1] Under the Act as it now reads it is clear that a judgment of invalidity would be a complete defense in an enforcement action. Sec. 204(e) (2). This provision, however, was added by the Stabilization Extension Act and, as previously noted, we are dealing here with an interpretation of the Act prior to its amendment by the Stabilization Extension Act.

844

ant in a criminal case to defend on the ground that the regulation is unconstitutional on its face. It seems that the same principle would control the case of a regulation invalid on its face and the case of a regulation duly invalidated by a judgment of this Court, and it might apply not only in criminal cases, but in proceedings for treble damages and injunctions, and perhaps in cases involving contracts affected by regulations. If not an absolute defense to a criminal case, a decision holding invalid a regulation a defendant was charged with violating might well have a decided influence upon the sentence to be imposed by the District Court. It would seem there would be one degree of wrong committed where the regulation was found fair and equitable and was wilfully violated and another degree of wrong where the regulation was held by a court of competent jurisdiction to have been unfair and inequitable or arbitrarily or capriciously put into effect by the Administrator.

As I read the opinion of the Court, there is no question but that the right to protest exists except where it has been cut off by a change in the regulation before the protest is filed. The Court seems to indicate that thereafter a filing of a protest is "untimely". I disagree with this construction of the Act for several reasons. First, as stated by this Court in Schanzer v. Bowles,[2] there was no time limitation fixed by the Act upon the filing of a protest based on grounds arising, as in this case, more than sixty days after the issuance of a regulation. The majority opinion of the Court, however, has now introduced a new bar to complainants' protest, a bar of which they had no notice from the language of the Act. This bar may be raised at any time, without any notice, by one of the parties to the litigation. Second, the construction completely obstructs the right of judicial review, in spite of the existence of substantial rights dependent upon such review.[3] To me this is such a denial of a reasonable opportunity to be heard as to constitute an offense against the due process clause of the Constitution. Since the language of the Act did not require such an interpretation, I feel the Act should be construed so as to avoid this evil.

I have considered the practical aspects of the views expressed in this dissent. It may and probably will develop that the District Court will certify for our consideration the question in the case at bar, which the Court refuses to decide in the present proceeding. If so, complainants will not suffer except in the matter of additional cost, delay and the effort involved in bringing another suit. But in this case and in similar cases there is the hazard of the possible refusal of the District Court to authorize the filing of a complaint or to permit all objections to be heard. If complainants, as I feel they do, have the unqualified right to be heard in the Emergency Court of Appeals as to all their objections, they should not be subjected to such hazard. I, therefore, believe it important in principle to hold that this Court should now pass upon an objection to the Regulation, which seems of great importance to complainants and which in my judgment they have presented in accordance with authority granted by the Emergency Price Control Act of 1942.

---

[2] Em.App., 1944, 141 F.2d 262.

[3] It is no answer to state, as the Court does, that the provisions of the Stabilization Extension Act provide some right of review in the enforcement action. Such review lies in the discretion of the judge before whom the enforcement action is brought; it is not available as a matter of right. But the important point is that it did not exist under the original Act with whose interpretation we are here concerned.