## CORN PRODUCTS REFINING CO. ET AL. *v.* FEDERAL TRADE COMMISSION.

No. 680.   Argued February 28, March 1, 1945.—Decided April 23, 1945.

*Mr. Parker McCollester,* with whom *Messrs. George deForest Lord, Frank H. Hall* and *Samuel A. McCain* were on the brief, for petitioners.

*Solicitor General Fahy,* with whom *Assistant Attorney General Berge, Messrs. Charles H. Weston, Paul A. Freund, Sigmund Timberg, W. T. Kelley* and *Walter B. Wooden* were on the brief, for respondent.

MR. CHIEF JUSTICE STONE delivered the opinion of the Court.

Petitioners, a parent corporation and its sales subsidiary, use a basing point system of pricing in their sales

of glucose. They sell only at delivered prices, computed by adding to a base price at Chicago the published freight tariff from Chicago to the several points of delivery, even though deliveries are in fact made from their factory at Kansas City as well as from their Chicago factory. Consequently there is included in the delivered price on shipments from Kansas Cty an amount of "freight" which usually does not correspond to freight actually paid by petitioners.

The Federal Trade Commission instituted this proceeding under § 11 of the Clayton Act, c. 323, 38 Stat. 730, 15 U. S. C. § 21, charging that petitioners' use of this single basing point system resulted in discriminations in price between different purchasers of the glucose, and violated § 2 (a) of the Act, as amended by § 1 of the Robinson-Patman Act, c. 592, 49 Stat. 1526, 15 U. S. C. § 13. The complaint also charged petitioners with other discriminations in prices, or in services rendered to favored customers, which will presently be stated in detail, all in violation of § 2 (a) or § 2 (e) of the Clayton Act, as amended.

Section 2 (a) provides in part:

"(a) . . . it shall be unlawful for any person engaged in commerce . . ., either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered . . ."

After hearings, at which much of the evidence was stipulated, the Commission made its findings of fact. It concluded that petitioners had violated § 2 of the Clayton Act, as amended, and ordered them to cease and desist from such violations. On petition to review the Commission's order, the Circuit Court of Appeals for the Seventh Circuit sustained the order, except in particulars not material here. 144 F. 2d 211.

We granted certiorari, 323 U. S. 706, because the questions involved are of importance in the administration of the Clayton Act in view of the widespread use of basing point price systems. The principal questions for decision are whether, when shipments are made from Kansas City, petitioners' basing point system results in discriminations in price between different purchasers of glucose, within the meaning of § 2 (a); and, if so, whether there is support in the evidence for the finding of the Commission that these discriminations have the effect on competition defined by that section. Further questions are raised as to whether the other discriminations charged violate § 2 (a) and § 2 (e).

## I. Basing Point Practices.

The evidence as to petitioners' basing point system for the sale of glucose was stipulated. The Commission found from the evidence that petitioners have two plants for the manufacture of glucose or corn syrup, one at Argo, Illinois, within the Chicago switching district, and the other at Kansas City, Missouri. The Chicago plant has been in operation since 1910, and that at Kansas City since 1922. Petitioners' bulk sales of glucose are at delivered prices, which are computed, whether the shipments are from Chicago or Kansas City, at petitioners' Chicago prices, plus the freight rate from Chicago to the place of delivery. Thus purchasers in all places other than Chicago pay a higher price than do Chicago purchasers. And in the case of all shipments from Kansas City to purchasers in cities

having a lower freight rate from Kansas City than from Chicago, the delivered price includes unearned or "phantom" freight, to the extent of the difference in freight rates. Conversely, when the freight from Kansas City to the point of delivery is more than that from Chicago, petitioners must "absorb" freight upon shipments from Kansas City, to the extent of the difference in freight.

The Commission illustrated the operation of the system by petitioners' delivered prices for glucose in bulk in twelve western and southwestern cities, to which shipments were usually made from Kansas City. On August 1, 1939, the freight rates to these points of delivery from Chicago were found to exceed those from Kansas City by from 4 to 40 cents per hundred pounds, and to that extent the delivered prices included unearned or phantom freight. As petitioners' Chicago price was then $2.09 per hundred pounds, this phantom freight factor with respect to deliveries to these twelve cities represented from 2 to 19% of the Chicago base price. From this it follows, as will presently be seen, that petitioners' net return at their Kansas City factory on sales to these twelve cities, in effect their f. o. b. factory price, varied according to the amount of phantom freight included in the delivered price.

Much of petitioners' glucose is sold to candy manufacturers, who are in competition with each other in the sale of their candy. Glucose is the principal ingredient in many varieties of low-priced candies, which are sold on narrow margins of profit. Customers for such candies may be diverted from one manufacturer to another by a difference in price of a small fraction of a cent per pound.

The Commission found that the higher prices paid for glucose purchased from petitioners by candy manufacturers located in cities other than Chicago, result in varying degree in higher costs of producing the candies. The degree in each instance varies with the difference in the delivered price of the glucose, and the proportion of glu-

cose in the particular candy. Manufacturers who pay unearned or phantom freight under petitioners' basing point system necessarily pay relatively higher costs for their raw material than do those manufacturers whose location with relation to the basing point is such that they are able to purchase at the base price plus only the freight actually paid. The Commission found that the payment of these increased prices imposed by the basing point system "may . . . diminish" the manufacturers' ability to compete with those buyers at lower prices.

The Commission concluded from these facts that petitioners' basing point system resulted in discriminations in price among purchasers of glucose, and that the discriminations result in substantial harm to competition among such purchasers. Petitioners challenge each conclusion.

*First.* Section 2 (a) of the Clayton Act, as amended, makes it unlawful for any person, "either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . ." The statute permits differentials "which make only due allowance for differences in the cost of manufacture, sale, or delivery . . ."

Petitioners' pricing system results inevitably in systematic price discriminations, since the prices they receive upon deliveries from Kansas City bear relation to factors other than actual costs of production or delivery. As in the case of the twelve cities selected by the Commission for illustrative purposes, the freight actually paid by petitioners in making deliveries usually varies from the freight factor from Chicago, used in computing the delivered price. When the actual freight is the lesser of the two, petitioners charge and collect unearned or phantom freight; when it is the greater, petitioners absorb the excess freight, which they pay, but do not include in the computation of their delivered price.

In either event, on shipments from Kansas City, the delivered price to the purchaser depends not only on the base price plus the actual freight from Kansas City, but also upon the difference between the actual freight paid and the freight rate from Chicago which is included in the delivered price. This difference also results in varying net prices to petitioners at their factory at Kansas City, according to the destination of the glucose. The factory net varies according as petitioners collect phantom freight or absorb freight, and in each case in the amount of this freight differential.[1] The price discriminations resulting from this systematic inclusion of the freight differential in computing the delivered price are not specifically permitted by the statute. Hence they are unlawful, unless, as petitioners argue, there is an implicit exception to the statute for such a basing point system.

---

[1] The illustrative prices found by the Commission show this sharply varying factory net and also the amounts of phantom freight. The figures given are upon deliveries from Kansas City for August 1, 1939, when the Chicago base price was $2.09.

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| | Freight from Chicago | Delivered Price (Chicago Base Price, $2.09, plus Column A) | Actual Freight from Kansas City | Net to Petitioners at Factory in Kansas City (Column B minus Column C) | Variance in Petitioners' Net from their Net on Deliveries at Kansas City | Phantom Freight (Column A minus Column C) |
| Kansas City, Missouri. | $0.40 | $2.49 | $0.00 | $2.49 | $0.00 | $0.40 |
| St. Joseph, Missouri___ | .40 | 2.49 | .09 | 2.40 | —.09 | .31 |
| Springfield, Missouri__ | .40 | 2.49 | .36 | 2.13 | —.36 | .04 |
| Fort Smith, Arkansas_ | .65 | 2.74 | .45 | 2.29 | —.20 | .20 |
| Hutchinson, Kansas___ | .61 | 2.70 | .36 | 2.34 | —.15 | .25 |
| Lincoln, Nebraska_____ | .45 | 2.54 | .13 | 2.41 | —.08 | .32 |
| Sioux City, Iowa_____ | .40 | 2.49 | .24 | 2.25 | —.24 | .16 |
| Waco, Texas_____ | .85 | 2.94 | .63 | 2.31 | —.18 | .22 |
| Sherman, Texas_____ | .77 | 2.86 | .54 | 2.32 | —.17 | .23 |
| San Antonio, Texas___ | .88 | 2.97 | .69 | 2.28 | —.21 | .19 |
| Denver, Colorado_____ | .66 | 2.75 | .56 | 2.19 | —.30 | .10 |
| Salt Lake City, Utah__ | .77 | 2.86 | .67 | 2.19 | —.30 | .10 |

Petitioners point out that there is no discrimination under their basing point system between buyers at the same points of delivery, and urge that the prohibition of § 2 (a) is directed only at price discriminations between buyers at the same delivery points. There is nothing in the words of the statute to support such a distinction, since the statute is not couched in terms of locality. And its purpose to prevent injuries to competition through price discriminations would preclude any such distinction, not required by its language. The purchasers of glucose from petitioners are found to be in competition with each other, even though they are in different localities. The injury to the competition of purchasers in different localities is no less harmful than if they were in the same city.

We find nothing in the legislative history of the Clayton or Robinson-Patman Acts to support the suggested distinction. It is true that § 3 of the Robinson-Patman Act, 15 U. S. C. § 13a, incorporating the Borah-Van Nuys Bill, S. 4171, 74th Cong., 2d Sess., imposes criminal penalties for selling goods "in any part of the United States at prices lower than those exacted . . . elsewhere in the United States for the purpose of destroying competition . . ." But this section does not restrict the operation of the prohibitions, with civil sanctions, of the Robinson-Patman amendments to § 2 (a) of the Clayton Act. This was specifically pointed out by the Conference Report on the Robinson-Patman Act.[2] H. Rep. No. 2951, 74th Cong., 2d Sess., p. 8.

Petitioners further contend that basing point systems were well known prior to the enactment of the Robinson-Patman Act and were considered by Congress to be legal. From this petitioners conclude that they remained legal in the absence of a clear command to the contrary. Cf.

---

[2] The report said: "Section 3 authorizes nothing which that amendment [to § 2 of the Clayton Act] prohibits, and takes nothing from it."

*Parker* v. *Motor Boat Sales,* 314 U. S. 244; *Helvering* v. *Griffiths,* 318 U. S. 371. But we think that the premise falls, and with it the conclusion, whatever it might be if the premise were valid.

In support of the legality of basing point systems, petitioners rely on *Maple Flooring Assn.* v. *United States,* 268 U. S. 563, 570, and *Cement Manufacturers Assn.* v. *United States,* 268 U. S. 588, 597. But these were suits to restrain violations of the Sherman Act, and did not involve the prohibition of the Clayton Act upon discriminations in price. The only question for decision in those cases was whether there was a concerted price-fixing scheme among competing sellers, accomplished in part by their adoption of a uniform basing point system; in fact, no prohibited concert of action was found.

In any event, the basing point systems involved in those cases were quite unlike that used by petitioners. In the *Maple Flooring* case, *supra,* the single basing point was so close to most of the points of production as to result in but trivial freight variances; and the defendants in that case were willing to sell on a f. o. b. mill basis, whenever the purchaser so requested. In the *Cement* case, *supra,* the defendants used a multiple basing point system, with a basing point at or near each point of production. Under this system, any manufacturer, in order to compete in the territory closer freightwise to another, would absorb freight, by adjusting his mill price to make his delivered price as low as that of his competitors. Under this system the delivered price for any locality was determined by the nearest basing point. We have no occasion to decide whether a basing point system such as that in the *Cement* case is permissible under the Clayton Act, in view of the provisions of § 2 (b), permitting reductions in price in order to meet a competitor's equally low price. Cf. *Federal Trade Commission* v. *A. E. Staley Mfg. Co., post,* p. 746.

When the Robinson-Patman Act was adopted in 1936,

there was no settled construction of the Clayton Act in the federal courts contrary to that now urged by the Commission, as was the case with the measures involved in *Helvering* v. *Griffiths, supra.* Nor was there any settled administrative construction to the contrary. In fact in 1924 in the only decision involving the problem, the Federal Trade Commission, after extensive investigation and hearings, ordered the United States Steel Corporation and its subsidiaries to cease and desist from the sales of their rolled steel products on the "Pittsburgh-Plus" price system. 8 F. T. C. 1. The Commission held that the use of a single basing point at Pittsburgh for steel plants over the country was a violation of § 2 of the Clayton Act, as well as § 5 of the Federal Trade Commission Act, 15 U. S. C. § 45, as they then read. The respondents in that case sought no review of the Commission's order and filed with the Commission a formal statement of intended compliance with it.

Petitioners also rely on the failure of the Commission to make further orders against basing point systems in the period from 1924 to the passage of the Robinson-Patman Act in 1936. The Commission undertook no further proceedings because of difficulties of enforcement which it attributed to the exemption provisions of § 2 and to decisions of the lower federal courts in Clayton Act cases. Instead it pressed for clarifying amendments to the Act. See the Commission's Final Report on the Chain Store Investigation (1936), Sen. Doc. No. 4, 74th Cong., 1st Sess., pp. 89–90, 96–97. The Robinson-Patman Act was adopted in response to the Commission's recommendation that defects in § 2 be remedied and its prohibition of price discrimination strengthened.

Finally, petitioners argue that Congress, by the rejection of a provision of the Robinson-Patman Bill, which would have in effect prohibited all basing point systems, has indicated its intention to sanction all such systems.

This provision, as reported to the House by the Committee on the Judiciary, would have defined "price," as used in § 2 of the Clayton Act, as meaning "the amount received by the vendor after deducting actual freight or cost of other transportation, if any, allowed or defrayed by the vendor."

The practical effect of this provision would have been to require that the price of all commodities sold in interstate commerce be computed on an f. o. b. factory basis, in order to avoid the prohibited discriminations in selling price. It would have prohibited any system of uniform delivered prices, as well as any basing point system of delivered prices. These effects were recognized in the Committee's report, see H. Rep. No. 2287, 74th Cong., 2d Sess., p. 14, and in the debates upon the Robinson-Patman Bill. Cf. 80 Cong. Rec. 8118, 8223–8224. Indeed, the provision would have prohibited such a multiple basing point system as that in *Cement Manufacturers Assn.* v. *United States, supra,* as well as the present system.

Such a drastic change in existing pricing systems as would have been effected by the proposed amendment engendered opposition, which finally led to the withdrawal of the provision by the House Committee on the Judiciary. 80 Cong. Rec. 8102, 8140, 8224. We think this legislative history indicates only that Congress was unwilling to require f. o. b. factory pricing, and thus to make all uniform delivered price systems and all basing point systems illegal per se. On the contrary we think that it left the legality of such systems to be determined accordingly as they might be within the reach of § 2 (a), as enacted, and its more restricted prohibitions of discriminations in delivered prices.

We conclude that the discriminations involved in petitioners' pricing system are within the prohibition of the Act. We pass to the question whether these discriminations had the prescribed effect on competition.

*Second.* Section 2 (a) of the Clayton Act, as amended, prohibits only discriminations whose "effect . . . may be substantially to lessen competition . . . in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: . . ." Petitioners insist that the Commission's findings, based upon the facts stipulated, do not support its conclusion that petitioners' discriminations have the prescribed effect.

It is to be observed that § 2 (a) does not require a finding that the discriminations in price have in fact had an adverse effect on competition. The statute is designed to reach such discriminations "in their incipiency," before the harm to competition is effected. It is enough that they "may" have the prescribed effect. Cf. *Standard Fashion Co.* v. *Magrane-Houston Co.*, 258 U. S. 346, 356–357. But as was held in the *Standard Fashion* case, *supra*, with respect to the like provisions of § 3 of the Clayton Act, prohibiting tying clause agreements, the effect of which "may be to substantially lessen competition," the use of the word "may" was not to prohibit discriminations having "the mere possibility" of those consequences, but to reach those which would probably have the defined effect on competition.

Since petitioners' basing point system results in a Chicago delivered price which is always lower than any other, including that at Kansas City, a natural effect of the system is the creation of a favored price zone for the purchasers of glucose in Chicago and vicinity, which does not extend to other points of manufacture and shipment of glucose. Since the cost of glucose, a principal ingredient of low-priced candy, is less at Chicago, candy manufacturers there are in a better position to compete for business, and manufacturers of candy located near other factories producing glucose, distant from the basing point,

as Kansas City, are in a less favorable position. The consequence is, as found by the Commission, that several manufacturers of candy, who were formerly located in Kansas City or other cities served from petitioners' Kansas City plant, have moved their factories to Chicago.

Further, we have seen that prices in cities to which shipments are made from Kansas City, are frequently discriminatory, since the prices in such cities usually vary according to factors, phantom freight or freight absorption, which are unrelated to any proper element of actual cost. And these systematic differentials are frequently appreciable in amount. The Commission's findings that glucose is a principal ingredient of low priced candy and that differences of small fractions of a cent in the sales price of such candy are enough to divert business from one manufacturer to another, readily admit of the Commission's inference that there is a reasonable probability that the effect of the discriminations may be substantially to lessen competition.

The weight to be attributed to the facts proven or stipulated, and the inferences to be drawn from them, are for the Commission to determine, not the courts. See *Federal Trade Commission* v. *Pacific States Paper Trade Assn.*, 273 U. S. 52, 63; *Federal Trade Commission* v. *Algoma Lumber Co.*, 291 U. S. 67, 73; cf. *Labor Board* v. *Southern Bell Tel. Co.*, 319 U. S. 50, 60. We cannot say that the Commission's inference here is not supported by the stipulated facts, or that it does not support the Commission's order.

## II. *Booking Practices.*

Ordinarily, when petitioners announce an advance in the price of glucose, they allow their customers a period of five days to "book" orders, that is, secure options to purchase, at the old price, and a period of thirty days in which to take delivery upon the options. The Commis-

sion charged that petitioners have further violated § 2 (a) of the Clayton Act, as amended, by permitting certain favored customers to secure options for the purchase of glucose, and to take delivery at the old price, for periods longer than those usually permitted to other customers. The Commission also charged other violations of § 2 (a) in that petitioners favored certain tank wagon customers by permitting them to book orders at the lower prices charged for tank car deliveries, and to take deliveries by tank wagon over extended periods of time. The Commission found, upon ample evidence, that these discriminations were in fact made by petitioners.

Petitioners assert that the practices prohibited by § 2 (a) are discriminations in price, and not in the terms and conditions of sale other than price. They rely on the fact that in the course of the progress of the Robinson-Patman Bill through Congress, the phrase "terms of sale," originally included in the prohibited discriminations, was stricken from the bill. But even if the contention be accepted, we cannot ignore the fact that the present discriminations in the terms of sale operated to permit the favored customers to purchase at a lower price than other customers, so that their only practical effect was to establish discriminations in price, precisely the evil at which the statute was aimed. And the Conference Committee, in reporting on this elimination of the phrase "terms of sale" from the bill, made it clear that § 2 (a) still applied to indirect as well as direct discriminations in price. It said that with the elimination of the phrase "terms of sale," the act is inapplicable to "terms of sale except as they amount in effect to the indirect discriminations in price within the meaning of the remainder of subsection (a)." H. Rep. No. 2951, 74th Cong., 2nd Sess., p. 5.

Petitioners also contend that these sales to favored customers were to meet the competition of other sellers of glucose, and were therefore excepted from the pro-

hibition of § 2 (a), by the proviso of subsection (b) of § 2 of the Clayton Act, as amended. Subsection (b) provides:

"Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price . . . , the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price . . . was made in good faith to meet an equally low price of a competitor . . ."

The only evidence said to rebut the prima facie case made by proof of the price discriminations was given by witnesses who had no personal knowledge of the transactions, and was limited to statements of each witness's assumption or conclusion that the price discriminations were justified by competition. Examination of the testimony satisfies us, as it did the court below, that it was insufficient to sustain a finding that the lower prices allowed to favored customers were in fact made to meet competition. Hence petitioners failed to sustain the burden of showing that the price discriminations were granted for the purpose of meeting competition. Cf. *Federal Trade Commission* v. *A. E. Staley Mfg. Co., post,* p. 746.

Finally it is contended that there was no evidence to support the Commission's finding, which was referable to these practices as well as petitioners' basing point practices, that the discriminations in price may diminish competition within the meaning of § 2 (a). This finding as to the effect of both types of discrimination was based on the same stipulation of facts which we have already considered in connection with the basing point practices.

Since the customers here are the same manufacturers of low-priced candies as were there involved, and since the price discriminations here are relatively substantial in a field where differences of a fraction of a cent in the price of candy are sufficient to divert business from one manufacturer to another, we think that the stipulation, which we find to be applicable to these as well as the basing point practices, is sufficient to support the finding of the prescribed effect on competition.

## III. *Discounts to Purchasers of By-Products.*

Still other price discriminations by petitioners charged and found by the Commission were discounts allowed to certain favored purchasers of gluten feed and meal, by-products of petitioners' refining of corn, and other discounts allowed to certain favored purchasers of starch and starch products. It was not and is not contended that these allowances were due to differences in the cost of manufacture, sale or delivery. But it is asserted that these discriminations did not violate § 2 (a), since there was not the requisite effect on competition.

It was stipulated, and the Commission found, that the allowances in question were "sufficient," if and when reflected in whole or in substantial part in resale prices, to attract business to the favored purchasers away from their competitors, "or to force [their] competitors to resell . . . at a substantially reduced profit, or to refrain from reselling." But it is asserted that there is no evidence that the allowances ever were reflected in the purchasers' resale prices. This argument loses sight of the statutory command. As we have said, the statute does not require that the discriminations must in fact have harmed competition, but only that there is a reasonable possibility that they "may" have such an effect. We think that it was permissible for the Commission to infer that these discriminatory allowances were a substantial threat to competition.

## IV. *Advertising Allowances.*

The Commission also charged and found that petitioners violated § 2 (e) of the Clayton Act, which provides:

"(e) . . . it shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms."

The alleged violation consisted of advertising expenditures made by petitioners for the Curtiss Candy Company in order to promote the sale of dextrose or corn sugar for use in candy manufacture. For this purpose petitioners entered into an arrangement with the Curtiss Candy Company, whereby during the years 1936 to 1939 they spent over $750,000 in advertising Curtiss candy as being "rich in dextrose." At the same time, Curtiss advertised its candy as being "rich in dextrose," and made the same statement on its labels. While Curtiss was free to purchase dextrose used in the advertised candies from other manufacturers, it in fact made all such purchases from petitioners, in annually increasing quantities until it purchased a total of seven million pounds in 1939. During the same period it purchased of petitioners large quantities of glucose, the purchases increasing from nothing in 1937 to almost fifteen million pounds in 1939. Although petitioners sold dextrose to others, it did not furnish proportionally equal advertising services to them.

Petitioners say that the advertising arrangement is not forbidden by § 2 (e) because it was not made with the Curtiss Candy Company as a "purchaser." But during the period in question the Curtiss Company was in fact a purchaser of petitioners' commodity. The Commission could

properly infer that the advertising for which petitioners paid, contemplated the sale of that commodity to Curtiss, and that the advertising contemplated the offering for sale of the candy by Curtiss. Petitioners thus furnished a service connected with the sale or offering for sale of a commodity upon terms not accorded to other purchasers. The statute does not require that the discrimination in favor of one purchaser against another shall be provided for in a purchase contract or be required by it. It is enough if the discrimination be made in favor of one who is a purchaser and denied to another purchaser or other purchasers of the commodity.

It is said also that the Curtiss Company was not a purchaser of a commodity "bought for resale, with or without processing" within the meaning of § 2 (e), since the Curtiss Company buys dextrose from petitioners, but uses it with other ingredients to produce candy, an entirely new commodity, which it sells. While the Act does not define the term "processing," the conversion of dextrose into candy would seem to conform to the current understanding that processing is a mode of treatment of materials to be transformed or reduced to a different state or thing. See *Cochrane* v. *Deener*, 94 U. S. 780, 788. In view of the purpose of the statute to prevent the enumerated discriminations attending the sale of a commodity for resale, the precise nature or extent of the processing before resale would seem to be immaterial. The statute is aimed at discrimination by supplying facilities or services to a purchaser not accorded to others, in all cases where the commodity is to be resold, whether in its original form or in a processed product. The evils of the discrimination would seem to be the same whether the processing results in little or much alteration in the character of the commodity purchased and resold.

And finally it is said that the Commission was without jurisdiction because the dextrose sold by petitioners to

Curtiss was not found to have been sold in interstate commerce; that if the section is construed to apply to such transactions, it would be unconstitutional; and that, in any case, there is no showing that the transactions complained of, although not themselves in interstate commerce, have in any way affected such commerce. But the effect upon the commerce is amply shown by the interstate and national character of the Curtiss Company's business; by petitioners' advertising for Curtiss, which was itself frequently in interstate commerce, amounting to $750,000; and by Curtiss's own admission that it competed in the sale of its candy in interstate commerce, with all manufacturers of one cent and five cent bars of candy. Moreover, some of petitioners' sales to other companies, to whom these allowances were not accorded, were made in interstate commerce; thus there was a discrimination against sales in interstate commerce, well within the power of the Commission to remedy.

Petitioners make a number of other arguments or contentions of lesser moment which we have considered but find it unnecessary to discuss. We conclude that the advertising furnished by petitioners was a service or facility "connected with the processing . . . sale, or offering for sale" of the commodity purchased by the Curtiss Company upon terms not accorded to other purchasers, and therefore violated the statute.

The several violations of §§ 2 (a) and 2 (e) of the Clayton Act, found by the Commission, sustained by the court below, and brought here for review, fall within the prohibitions of the Act. The Commission's conclusions are amply supported by its findings and the evidence, and the judgment is

*Affirmed.*

MR. JUSTICE ROBERTS took no part in the consideration or decision of this case.

MR. JUSTICE JACKSON concurs in the result.