BOWLES, Price Adm'r, Office of Price Administration, v. DAIRYMEN'S LEAGUE CO-OP. ASS'N et al.

District Court, S. D. New York.

June 22, 1945.

---

---

Paul L. Ross, of New York City (Elliott Biskind, of New York City, of counsel), for plaintiff.

Fennelly, Lowenstein, Engelhard & Pitcher, of New York City, for defendant Dairymen's.

Herman B. Zipser, of New York City, for defendant Caldwell.

Harry L. Marcus, of Brooklyn, N. Y., for defendants Silvercrest Farms, Inc. and another.

RIFKIND, District Judge.

Plaintiff, having commenced an action by a complaint alleging violations of Maximum Price Regulation 280 (7 F.R. 10144; 8 F.R. 16795; 9 F.R. 1622), and Regional Order G–1 (9 F.R. 2714; 9 F.R. 3618; 9 F.R. 7590), and praying for injunctive relief against all the defendants and a judgment for treble damages against defendant Dairymen's, now moves for an interlocutory injunction. Section 205(a), Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 925(a).

The commodity which is the subject of this suit is fluid milk. The commerce in this commodity is an arena in which many regulatory forces, federal, state[1] and municipal, are in simultaneous operation. Of these, the Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, 7 U.S.C.A. § 601 et seq., together with Order No. 27, issued thereunder, and the Emergency Price Control Act are the most pervasive. Dairymen's buys its milk under the former and sells it under the latter. Each system of regulation is directed to its own principal object and it is important that the delicate balance among these contending forces shall not be upset.

The specific violations of Order G–1 charged against the defendants are (1) that Dairymen's has collected and that the other defendants have paid a price for fluid milk which included a factor for butterfat content of the milk in excess of the actual butterfat content of the milk sold; and (2) that Dairymen's has collected and the other defendants have paid, as part of the price of the milk, a transportation charge in excess of the amount permitted by Order G–1.

The material facts are not in dispute. M. P. R. 280 went into effect by its terms on December 3, 1942. Among other food products, it regulated the sale of milk in bulk, at wholesale, by primary handlers to a named class of purchasers. Interhandler sales were not covered by the regulation. On August 19, 1943, the Price Administrator promulgated an amendment to M.P.R. 280 which became Section 1351.817a of that regulation. By that amendment the Administrator delegated to every Regional Administrator power to establish maximum prices for the sale of fluid milk first physically received from producers by handlers at a receiving station or processing plant within the region of the Regional Administrator. Such delegation of authority was permitted by Sections 201(b) and 201(d) of the Emergency Price Control Act, 50 U.S.C.A.Appendix, § 921 (b, d).

Pursuant to the authority so conferred, the Regional Administrator of Region II (comprising New York, New Jersey Pennsylvania, Delaware, Maryland and District of Columbia) issued Order G–1, which by its terms became effective on February 16, 1944. By the terms of that order, the selling price of fluid milk in bulk sold by a "primary handler" to a "dealer" may not exceed, in the category of transactions involved in this suit, the following:

The primary handler's "fluid milk cost," plus 30¢ per hundredweight, f.o.b. the primary handler's receiving or processing plant plus a specified amount for delivery in cans if so delivered, plus a specified amount for pasteurization if pasteurized, plus a transportation charge where delivery is made to a place designated by the purchaser. Such transportation charge may not exceed the lowest of the following:

1. The lowest available common carrier rate.

2. The lowest available contract carrier rate.

---

[1] Agriculture and Markets Law, McKinney's Consol.Laws, c. 69 Book 2-B, Article 4.

3. When transportation is provided in trucks owned or controlled by the seller, the reasonable value of such transportation.

From the affidavits and arguments presented on the motion the following issues emerge:

1. Has the Order G–1 been issued by an officer duly authorized by law to make such regulation; and has this suit been instituted by an officer authorized to prosecute such litigation? 2. Is Dairymen's a primary handler as defined by the Order? 3. Is the method of doing business pursued by Dairymen's permitted by the Order? 4. What is the meaning of "available" in the formula for determining transportation charges?

■ 1. The challenge to the authority of the promulgating agency in issuing Order G–1 and in instituting this suit springs from Section 3(e) of the Emergency Price Control Act, as amended by the Stabilization Extension Act of 1944, 50 U.S.C.A.Appendix, § 903(e), which reads as follows:

"Notwithstanding any other provision of this or any other law, no action shall be taken under this Act by the Administrator or any other person with respect to any agricultural commodity without the prior approval of the Secretary of Agriculture; except that the Administrator may take such action as may be necessary under section 202 and section 205 to enforce compliance with any regulation, order, price schedule or other requirement with respect to an agricultural commodity which has been previously approved by the Secretary of Agriculture."

The approval of the Secretary of Agriculture was given to M.P.R. 280; but the language of M.P.R. 280, (which deals with many food products) reporting such approval does not require the inference that the Administrator regarded the fluid milk here under discussion as an agricultural commodity.[2]

It has been stipulated by plaintiff and defendant Dairymen's that the approval of the Secretary of Agriculture has not been given to the mentioned amendment to M.P.R. 280 nor to Order G–1. It is the contention of the plaintiff that the milk here considered is not an agricultural commodity but a processed agricultural commodity and

therefore not within the provisions of Section 3(e). It is not disputed between the parties that if the milk herein involved is a processed agricultural commodity the approval of the Secretary of Agriculture is not required. This agreement arises from the distinction drawn in the statute between agricultural commodities and commodities processed from any agricultural commodities, Sections 3(a), 3(c); and see, Bowles v. American Brewery, 4 Cir., 1945, 146 F.2d 842; Bowles v. Sunshine Packing Corp. of Pennsylvania, D.C.W.D.Pa.1945, 59 F.Supp. 164. The posture of the problem is, therefore, this: that the O. P. A. Administrator has classified milk received from producers at a receiving station or processing plant, where generally it is cooled for shipment, as not an agricultural commodity within the meaning of Section 3(e). Whether the Administrator is right in so doing is clearly a question of validity which, by Section 204, 50 U.S.C.A.Appendix, § 924, has been withdrawn from consideration by the district courts and vested exclusively in the Emergency Court of Appeals.

Defendant has submitted affidavits by persons apparently competent to express an opinion asserting that such fluid milk is not a processed agricultural commodity, whereas the plaintiff has submitted affidavits to substantiate its claim that it is. The very existence of this issue makes peculiarly relevant the proscription against the consideration of questions of validity. For manifestly, if the Administrator's classification is wrong, then the amendment to M.P.R 280 and Order G–1 have not been issued by an officer duly authorized to make such regulations and are invalid. Such a controversy is one with respect to validity; and the policy of the statute to centralize the disposition of such questions has been meticulously observed in the decisions which have construed Section 204 of the Act. Hence this case does not present for decision the intriguing question whether a district court may refuse to enforce a regulation "invalid on its face." Bowles v. Willingham, 1944, 321 U.S. 503, 526, 64 S.Ct. 641, 88 L.Ed. 892 (concurring opinion of Rutledge, J.); Rottenberg v. United States, 1 Cir., 1943, 137 F.2d 850, 857; Brown v. W. T. Grant Co., D.C.S.D.N.Y.1943, 53 F. Supp. 182, 188; Thomas Paper Stock Co.

---

[2] The relevant language of M.P.R. 280 is as follows: "Therefore, with the concurrence of the Secretary of Agriculture with respect to agricultural commodi-

ties and under the authority vested in the Price Administrator * * * Maximum Price Regulation No. 280 is hereby issued".

v. Bowles, Em.App., 1945, 148 F.2d 831, 843.

The uniform lesson of the decisions construing Section 204 of the Act is to avoid carrying out exceptions to the policy of securing nationally uniform adjudication on the issue of validity and to confine such questions to the Emergency Court and to the Supreme Court. Yakus v. United States, 1944, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834; Bowles v. Willingham, supra; Cullen v. Bowles, 2 Cir., 1945, 148 F.2d 621; Rosenweig v. United States, 9 Cir., 1944, 144 F.2d 30; Bowles v. American Brewery, 4 Cir., 1945, 146 F.2d 842, 844.

It is undisputed that the institution of this suit has not been approved by the Secretary of Agriculture; but by the terms of Section 3(e) such approval, if required at all, is necessary only where required for the regulation.

The first question must, therefore, be decided against the defendants.

■ 2. Dairymen's is a primary handler as that term is defined in Order G–1. The definition reads:

"(2) Handler means any person who, on his own behalf or on behalf of another, purchases fluid milk from producers, associations of producers, or other handlers, and who sells such fluid milk at wholesale in bulk (other than in glass or paper containers), to any person, other than stores, hotels, restaurants and institutions * * * (ii) A 'farmers' cooperative' is also a handler with respect to that fluid milk processed for it by operators of milk receiving or processing plants, and with respect to that fluid milk handled in physical facilities for receiving, processing, or distributing fluid milk which are owned or leased by the cooperative, which fluid milk is sold by it at wholesale in bulk (other than in glass or paper containers), to any person, other than stores, hotels, restaurants and institutions. (3) 'Primary handler' means a handler who purchases fluid milk from producers and resells such fluid milk in bulk to other handlers and dealers".

That Dairymen's, which is a farmers' cooperative, is a purchaser from producers has been the position taken by Dairymen's in its correspondence with the O. P. A. in reference to M.P.R. 329. Although that position is now contested, there are logical reasons for treating it as fact. To reject that position now would mean that Dairymen's activities were not covered by the Order, whereas the history of the regulation makes it clear that both Dairymen's and plaintiff understood and intended that the Order should apply to its activities.

■ 3. That Dairymen's method of doing business is violative of the Order cannot be seriously questioned. Without going into the intricate details of milk pricing, it is sufficient for present purposes that Dairymen's methods depart from the regulation in both of the challenged respects. In calculating the price which Dairymen's must pay to producers under Marketing Order 27, a base price of $3.70 a hundredweight is applicable to milk with a 3.5% butterfat content. To that is added a premium of 4¢ for each 1/10 of 1% of butterfat in excess of 3.5%; and a deduction is made at the same rate for an equal percentage of deficiency. In determining its fluid milk costs for purposes of establishing a price to its customers, Dairymen's does not use the actual butterfat content of each milk shipment. Instead it makes an annual estimate at the beginning of each year of the butterfat content of the milk it will supply. For the current year its estimate is 3.9%. It charges its customers accordingly. It claims in the aggregate it would receive more money from all its customers if it calculated the butterfat content for each shipment but that established trade practices and the convenience of its customers dictate the use of the estimate. That, however, is not the test prescribed by the Order. It is probable that some of its customers underpay, but some unquestionably overpay. The latter is prohibited by the Order.

Defendant also relies upon an amendment to G–1 which reads:

"Where a primary handler co-mingles fluid milk purchased from more than one producer, the 'primary handler's fluid milk cost' shall be the weighted average cost of all such milk so purchased."

The terms of that amendment do not contemplate co-mingling by bookkeeping where in fact there has been no physical co-mingling in the milk shipped to an individual customer.

■ 3. The same objection which affects the method of calculating "fluid milk cost" also impairs Dairymen's method of calculating transportation charges. Instead of determining the actual transportation costs of each customer's shipment, within the limitations of the Order, Dairymen's uses a figure of 36¢ a hundredweight for

362

all its customers in the City of New York, regardless of the point of origin of the milk. This figure, it is said, is based on the assumption that the milk is hauled a distance of 200 miles. The Order does not permit the addition of phantom transportation charges to one customer, even though the seller absorbs part of the transportation costs of another customer. Compare, Corn Products Refining Co. v. Federal Trade Commission, 65 S.Ct. 961.

■■■ 4. A subsidiary question concerns the meaning of the word "available" in the transportation formula. It is the contention of the plaintiff that the term available in the phrase "lowest available common carrier rate" or "lowest available contract carrier rate" means the lowest rate available even though the means of transportation to which that rate is applicable is actually not available for use. In other words, if a common carrier rate between two points is published, then regardless of the fact that the service is for one reason or another not physically available, so that the shipper cannot possibly transport his milk by that means and he is obliged to use a contract carrier at a higher rate, he must nevertheless charge his customer the lower common carrier rate. This construction of the Order, it seems to me, is so violently at variance with its language and its manifest purpose that it cannot be entertained. If this construction were adopted, the comparison directed to be made by the Order would be a comparison between the rate on a hypothetical means of transportation and an actual means of transportation; whereas, the regulation in so many words prescribes a comparison of rates on available means of transportation. I am not unmindful of the rule that in the interpretation of an administrative regulation the court must necessarily look to the administrative construction "if the meaning of the words used is in doubt", Bowles v. Seminole Rock and Sand Co., 65 S.Ct. 1215. Here I see no room for doubt. Moreover, I have not been presented with any official interpretation by the Administrator which supports the strange construction advanced upon this hearing.

■■■ The Administrator's delay in acting on Dairymen's protest does not justify denial of an interlocutory injunction. The policy of the statute is that obedience to the regulation is exacted before its validity is adjudicated because delay would be fatal to the Congressional purpose, Brown v. W. T. Grant Co., supra.

The motion is granted. Settle findings and order on three days' notice.