191 F.2d 786
 MINNEAPOLIS-HONEYWELL REGULATOR CO.
v.
FEDERAL TRADE COMMISSION.
No.9584.
 United States Court of Appeals Seventh Circuit.
 July 5, 1951.
 
 R. L. Gilpatric, New York City, Will Freeman, Chicago, Ill., Donald C. Swatland, Murray W. McEniry, New York City, of counsel, for petitioner.
 William T. Kelley, Chief Counsel, James W. Cassedy, John W. Carter, Jr., Associate General Counsel and assistants, Federal Trade Commission, all of Washington, D.C., for respondent.
 Before KERNER, FINNEGAN, and LINDLEY, Circuit Judges.
 KERNER, Circuit Judge.
 
 
 1
 This is a proceeding to review Part III of an order of the Federal Trade Commission entered on Count III of a complaint filed by the Commission on February 23, 1943, charging in three counts violation by petitioner of § 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45, § 3 of the Clayton Act, and § 2 of the Clayton Act as amended by the Robinson-Patman Price Discrimination Act, 15 U.S.C.A. §§ 14 and 13. We shall refer to petitioner as M-H. Since M-H does not challenge Parts I and II of the order based on the first two counts of the complaint we shall make no further reference to them.
 
 
 2
 Following hearings before a trial examiner extending from August 12, 1943 to February 14, 1946, that officer rendered his report recommending dismissal of the charges contained in Count III on the ground that it did not appear that M-H had violated § 2 of the Clayton Act, as amended. The Commission rendered findings of fact and conclusions of law contrary to the report of the examiner and based its cease and desist order thereon. One member dissented.
 
 
 3
 The alleged violations of § 2(a) of the Clayton Act, as amended by the Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a) and (b), relate to M-H's practices in connection with the sale of automatic temperature controls to oil burner manufacturers for use in oil burners of the gun or pressure type and the rotary type, both for domestic heating plants. With respect to this the complaint charged price discriminations arising out of M-H's quantity discount pricing system, the effect of which 'has been or may be substantially to lessen competition in the line of commerce in which respondent (M-H) is engaged and to injure, destroy and prevent competition between the respondent and its competitors, and to injure, destroy and prevent competition between the customers of said respondent * * * .'
 
 
 4
 Part III of the order hereunder review provides:
 
 
 5
 'It Is Further Ordered that respondent * * * directly or through any corporate or other device in the sale of automatic temperature controls or other furnace controls in commerce * * * cease and desist from discriminating, directly or indirectly, in the price of such products of like grade and quality as among oil-burner manufacturers purchasing said automatic temperature controls and other furnace controls-
 
 
 6
 '1. By selling such controls to some oil-burner manufacturers at prices materially different from the prices charged other oil-burner manufacturers who in fact compete in the sale and distribution of such furnace controls, when the differences in price are not justified by differences in the cost of manufacture, sale, or delivery resulting from differing methods or quantities in which such products are sold or delivered.'
 
 
 7
 For a proper understanding of the case it is necessary to look to the history of M-H as related to the industry in which it became a dominant factor in its early days. M-H is the successor of two corporations, the Minneapolis Heat Regulator Company which began making heat regulating devices in 1885, and the Honeywell Heating Specialties Company, established in 1906. The two were consolidated in 1927. About 80% of its business is devoted to the manufacture of automatic temperature controls. Its principal competitors during the period here involved were the Mercoid Corporation which had made automatic controls for domestic oil burners since 1922, the Penn Electric Switch Company which started to manufacture and sell such controls in 1932, and the Perfex Corporation which began to sell one of the controls in 1936 and a complete line in 1937.
 
 
 8
 The process of manufacturing oil burners is one of fabrication in the sense that the manufacturer assembles and puts together the various parts including controls, motors, pumps, fans and transformers, which parts are generally purchased from different sources. Three controls are usually used in each burner, and these three are customarily dealt in as sets, with prices quoted for the sets rather than the individual units.
 
 
 9
 The examiner found that M-H 'has always * * * been a leader in the field * * * and in the development * * * of new and better controls, and * * * throughout the years has spent extensive sums of money in engineering and development work, not only creative engineering of new devices, but in the constant redesigning and improving of its products, and in the lowering of costs.' It has also advertised its products very extensively and has maintained 39 branch and district offices equipped with a complete line of its products as well as service personnel trained by M-H to service those products. The examiner also found that as a result of its advertising and the reputation of its controls for performance and efficiency in operation, there had been developed a large customer demand for and public acceptance of its controls which had for a number of years sold at higher prices than controls of other makes. This public demand enabled dealers to obtain higher prices for burners equipped with M-H controls than with those of its competitors, and there was evidence that there were some dealers who would not purchase burners without M-H controls.
 
 
 10
 The pricing system which the Commission found was a violation of the Act was a standard quantity discount system. M-H published list prices with discounts or net prices regularly allowed to its various customers according to the trade channels in which they were engaged. These were classified as oil-burner manufacturers who ordinarily use them in the fabrication of their burners, and wholesalers or jobbers and dealers who ordinarily handle them for repair, replacement or auxiliary equipment. Most of its business was with manufacturers who had to purchase at least 50 sets annually in order to qualify as such. M-H usually made contracts with such manufacturers at the beginning of the year, providing for quantity or bracket prices based upon either the number of controls purchased the previous year or, in some cases, the average for two years, or the estimated quantity the manufacturer expected to use during the contract year. If the manufacturer failed to purchase sufficient sets to entitle him to the bracket price allowed, M-H did not require additional payment. However, if he purchased a greater number he was allowed the larger quantity bracket price for the entire year with a credit or refund for the difference in price already paid. The brackets varied somewhat from year to year as to number of sets and prices. The bracket setup for 1941 is shown in Table I.[1]
 
 
 11
 The Commission found that this system had the capacity and tendency to induce the purchase of M-H controls by various manufacturers and tended to and did divert trade to M-H from its competitors and had had a substantial injurious effect on competition in the sale and distribution of controls. With respect to the effect on customer competition it found that by this system M-H discriminated in price in favor of customers buying in larger quantities as against those buying in smaller quantities; that changes in the price of controls to oil burner manufacturers resulted in many instances in corresponding changes in the price of completed oil burners and necessarily affected sales and profits; and that in some instances customers of M-H lost business to certain of their competitors who enjoyed lower control prices from M-H. Since it further found that the discriminatory differentials were justified by cost differentials only as to the prices in the first four brackets which were applicable to less than 45% of its manufacturer business, leaving over 55% of the business in the three lowest cost price brackets not subject to that defense, and that M-H had not established that any customer in those three brackets had received a lower price to meet an equally low price of a competitor, it concluded that the discriminations constituted violations of the Act. In reaching this conclusion it stated that the examiner was in error in his conclusion that the price discriminations given by M-H had not tended to substantially lessen, injure, prevent or destroy competition.
 
 
 12
 Under the rule of Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 496, 71 S.Ct. 456, 469, it is the duty of this court to examine the record as a whole, including the report of the examiner, in order to determine whether the evidence supporting the Commission's order is substantial. As the Court there observed, ' * * * evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony.' And we think the evidence supporting the conclusion may become even less substantial when it fails to persuade an experienced member of the Commission who dissents from its findings and conclusions.
 
 
 13
 With this general test of substantiality in mind we turn to a study of the evidence as it relates to the issue whether M-H discriminations in fact did or might tend to injure or prevent competition as between itself and its competitors or as between its customers. We deem this the primary issue here involved. Unless its discriminations do or may tend to injure competition there is no need for M-H to justify them. From our examination of the record as a whole we are convinced that the findings of the examiner were supported by very substantial evidence, considerable of which the Commission rejected because, it stated, it found it immaterial or uncorroborated.
 
 
 14
 Among the various undisputed facts as to the effect of M-H's practices on competitor competition, as summarized by M-H, are
 
 
 15
 (a) that the prices charged for controls by M-H's competitors were generally lower than those of M-H and that there is no evidence of any undercutting of its competitors' prices by M-H;
 
 
 16
 (b) that throughout the complaint period there existed the keenest kind of price competition among control manufacturers;
 
 
 17
 (c) that the total business of M-H's competitors increased, and the three new concerns which entered the industry after 1932 have enjoyed a steady growth in sales volume;
 
 
 18
 (d) that M-H's share of the available control business was reduced from 73% in 1937-1938 to only 60% in 1941;
 
 
 19
 (e) that in 1941 M-H lost to its competitors 53% of the control business of 31 customers who previously had standardized on M-H's controls; and
 
 
 20
 (f) that in that same year, 126 of M-H's other oil burner manufacturer-customers also purchased competitive controls.
 
 
 21
 The foregoing facts fully establish the examiner's finding that competitor competition was not injured, a finding concurred in by the dissenting member of the Commission, and they outweigh the facts relied upon by the Commission in reaching the opposite conclusion. And while the findings of an examiner are not 'as unassailable as a master's' (Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 492, 71 S.Ct. 456, 467), where it appears from the record that they are supported by a preponderance of the evidence, the action of the Commission in rejecting them is arbitrary. Folds v. Federal Trade Commission, 7 Cir., 187 F.2d 658, 661. M-H was entitled to meet the competition built up in its field, and even if it did succeed in retaining or diverting some business which might otherwise have gone to some of its competitors, where those competitors were able to enter its field and build thriving businesses in spite of M-H's commanding position and alleged wrongful practices, we think it cannot be said that the effect of those practices was substantially to injure competition. And we construe the Act to require substantial, not trivial or sporadic, interference with competition to establish violation of its mandate. Even though we assume that the burden of proving absence of injury to competition falls on the accused (see Samuel H. Moss, Inc., v. Federal Trade Commission, 2 Cir., 148 F.2d 378; Federal Trade Commission v. Standard Brands, Inc., 2 Cir., 189 F.2d 510, modified June 4, 1951), we think M-H has met that burden with respect to its competitor competition.
 
 
 22
 With respect to the question of customer competition a somewhat different problem is presented. The Commission based its conclusion that M-H's practices injured that competition on the general finding that because the price of the control represented the largest single item of cost among the various parts of the finished burner, changes in the price of controls to manufacturers resulted in corresponding changes in the price of completed burners and necessarily affected sales and profits. It further found generally that 'oil-burner manufacturers testified that the question of price was important in the purchase of automatic temperature controls and that they had lost business to certain competitors, including Quiet-Heet, who enjoyed lower control prices from respondent, although the exact volume of such lost business could not be calculated.'
 
 
 23
 The absence of causal connection between the price of controls and the price of the finished products generally is demonstrated by the stipulation entered into prior to the hearing:
 
 
 24
 'Some manufacturers paying higher prices for respondent's automatic temperature controls were able to, and often did, sell their oil burners complete with controls at prices below those which other similar manufacturers paying lower prices for respondent's * * * controls sold their oil burners.
 
 
 25
 'Some manufacturers paying lower prices for respondent's * * * controls were able to, and often did, sell their oil burners complete with controls at prices below those which other similar manufacturers paying higher prices for respondent's * * * controls sold their oil burners.'
 
 
 26
 Even though some manufacturers did testify that 'the question of price was important * * * and that they had lost business to certain competitors who enjoyed lower control prices * * * ' we think it is equally significant that other manufacturers who paid the higher prices testified that they did not lose business as a result of paying such higher control prices, and that they considered other factors of far greater importance in determining the price of the completed burner. They referred to such matters as manufacturing methods, overhead, distribution costs, service, advertising, as having an important bearing on comparative prices in addition to the costs of the component parts.
 
 
 27
 In further proof of its contention that the price of controls was not the vital factor in arriving at burner prices and in fact had very little relation to it, M-H submitted a table derived from the findings of a nationwide survey showing the range of prices charged by its customers in each price bracket for the year 1941.[2] From this survey, it will be noted that the highest price charged for burners, $114.50, was by a customer having the advantage of the lowest price bracket for M-H controls, and that a customer in the next-to-highest price bracket sold its burner for the lowest price, $45. Many variations can be made from these facts. All seem to add up to the one fact that there is little, if any, relationship between the prices of the controls and the prices of the burners into which the controls are built, hence that the evidence does not support the Commission's finding that 'changes in the price of * * * controls resulted in corresponding changes in the price of completed burners.'
 
 
 28
 Reference was made in the general finding quoted above to Quiet Heet as one of the manufacturers enjoying lower control prices to which other manufacturers lost an undetermined volume of business. There is no question on this record but that Quiet Heet, entering the field in 1936, very soon became the largest producer in the industry, and by 1941 was able to sell its burners at the lowest price. The Commission attributed this to the fact that it bought its controls from M-H for the lowest price. We think this is to ignore the vast discrepancy between the range of prices for controls and that for the finished burners. The fact was, as established by the evidence, that Quiet Heet entered the field with entirely different theories of production and distribution from those of its already established competitors. Its proprietor testified that he 'started out to merchandise it on a volume basis, effecting certain economies, making a few shortcuts here and there and trimming down my overhead and operating costs to the minimum.' Among those economies were the elimination of all field service which was one of the heavy items of expense of the higher price manufacturers, reduction of advertising costs to a minimum by its own use of printed postcards to the trade and by charging dealers for all advertising matter furnished to them, and adoption of cheaper packaging methods and materials. It was this type of economies that enabled Quiet Heet to sell its burner in 1941 for $68.50 less than its highest price competitor who paid the same price for the control, and for $66 less than its next highest price competitor who paid only $3.60 more for its controls, as shown in Table II, footnote 2.
 
 
 29
 Part of the fallacy of the Commission's position lies in its analysis of the competitive situation between the various manufacturers. This is reflected in its order where it refers to manufacturers 'who in fact compete in the sale and distribution of such furnace controls,' as if the controls themselves were the article of merchandise they dealt in instead of the burners of which the controls were only one part. It may be true that if the manufacturers were generally selling controls as such, a differential of two or three dollars in the price they paid for them would have a substantial effect on the price obtained. Under such circumstances a finding that a competitive advantage in purchase price paid would necessarily give rise to a competitive advantage in sale price would perhaps be justified. But where the controls were used in the manufacture of burners, the cost of which was determined by many other factors- cost of other materials and parts, service, advertising, to mention only a few- it cannot be said that discriminatory price differentials substantially injure competition or that there is any reasonable probability or even possibility that they will do so. Cf. Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 738, 742, 65 S.Ct. 961, 89 L.Ed. 1320; Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 46, 68 S.Ct 822, 92 L.Ed. 1196. And a mere possibility of such injury is insufficient to sustain a charge of violation of the Act. Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 742, 65 S.Ct. 961 89 L.Ed. 1320.
 
 
 30
 We are convinced that here 'the inferences on which the * * * findings were based were so overborne by evidence calling for contrary inferences that the findings * * * could not, on the consideration of the whole record, be deemed to be supported by 'substantial' evidence.' National Labor Relations Board v. Pittsburgh Steamship Co., 340 U.S. 498, 502, 71 S.Ct. 453, 456.
 
 
 31
 Since we have concluded that the Commission was in error in finding that the effect of M-H's practices was to substantially lessen or prevent competition between either it and its competitors or its customers, we do not reach the question whether M-H justified those practices by an adequate showing that its differentials in the lowest price brackets which it did not contend were justified by cost differentials were made in good faith to meet an equally low price of a competitor.
 
 
 32
 Part III of the order must be reversed and Count III of the complaint upon which it is based, dismissed. It is so ordered.
 
 
 
 *
 TABLE I
 Annual Volume Net Price
Bracket (Sets) Scale
 1 50-- 349 $17.35
 2 350-- 999 16.45
 3 1,000-- 2,499 15.90
 3A 2,500-- 4,999 15.35
 4 5,000-- 7,499 14.90
 4A 7,500-- 9,999 13.75
 5 10,000-- up 14.25
2
 TABLE II
 Prices Charged Oil Burner Range of Prices Charged
 Manufacturers by M-H Wholesalers by Oil Burner
 for Controls Manufacturers for Burners
 Low High
Bracket 1 $17.35 $50.00 $111.00
Bracket 2 16.45 45.00 96.20
Bracket 3 15.90 47.50 102.00
Bracket 3A 15.35 52.50 89.00
Bracket 4 14.90 61.70 100.00
Bracket 4A 14.25 55.00 101.25
Bracket 5 13.75 45.00 114.50